[Crim. No. 1161. Fourth Dist. Jan. 24, 1958.]

THE PEOPLE, Respondent, v MAY LEOLA RAMSEY et al., Appellants.

Morris Lavine and Z. B. West for Appellants.

Edmund G. Brown, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

MUSSELL, J.—Appellants were charged with the crime of abortion in one information and with the crime of abortion and two counts of conspiracy to commit abortion in a second information, both filed in Orange County. The prior felony convictions alleged in the information were admitted. The informations were consolidated for trial and trial by jury was waived. The court found appellants guilty as charged in each case and they were each sentenced to state prison. Appellants appeal from the judgments, contending that they were illegally arrested and that the evidence introduced at the trial was obtained as a result of unlawful search of the house in which they were arrested. The sufficiency of the evidence to sustain the convictions is not questioned, and it is conceded that the facts regarding the search, seizure and arrest of appellants are based upon the uncontradicted testimony of the police officers and the witnesses for the prosecution.

The facts and circumstances of the arrest and seizure herein are as follows: On October 5, 1956, John Baker, a deputy sheriff of Orange County, received a letter from the chief of police of Redwood City stating that a woman in Redwood City had been aborted in Orange County on September 24 and 25 at a place described as the first house beyond an orange grove on West Street in Garden Grove and near an elementary school, bearing a woman's name. The house was described as containing two bedrooms and a living room, each furnished

with maple furniture, and a third bedroom containing medical and surgical equipment. It was further stated in the letter that the woman was picked up in a 1955 or 1956 blue and white Ford by a male, 6 feet tall, 50-55 years old, with dark hair, graying at the temples. Accompanying him was a woman described as being 5 feet, 5 inches tall, about 55-60 years old, wearing her hair in a switch on the top of her head and speaking in a southern drawl. About an hour after the receipt of this letter, Baker and Hicks of the sheriff's office went to the West Street area and located an elementary school, across the street from which was an orange grove. The first house to the south on West Street bore the number 12362. The officers looked through the windows into two bedrooms and a living room, which were furnished with maple furniture. Deputy Baker, with the aid of a flash light, saw a letter in the mail box addressed to Milton G. Ramsey. He learned from a neighbor that she had seen a blue and white Ford at that address. A check of their files by the officers revealed that a Milton G. Ramsey had been arrested in 1929 on a charge of assault with intent to commit murder; that May Leola Ramsey, alias Margaret Reeves, had been sent to state prison for abortion.

On October 11, 1956, the deputies went to the West Street house and, as they approached, they observed a blue and white Ford pulling into the driveway. They obtained the license number of this car and found that it was registered to Milton Ramsey at 1011 223d Street, in the city of Torrance. They then went to the Long Beach police department and reviewed the Ramsey record in the 1948 abortion case. It appeared therefrom that May Leola Ramsey was the defendant and that her address was 1011 223d Street, in the city of Torrance. It was noted that in the 1948 case the victims were picked up before noon at a prearranged location and were taken to the place of abortion. On October 12, 1956, the officers checked with the public utilities in Orange County and learned that a Madeline Ramsey had applied for utility service by 'phone in November, 1955, and that there had been a minimum of gas and light service furnished. On October 13, 1956, Baker and Hicks observed a 1956 Plymouth automobile at the West Street address and after taking the license number of this car, they found it was registered to a Marvin Reeves in Torrance. On October 17, 1956, Baker and Hicks talked to an inspector in the Long Beach police department, who told them that Milton Ramsey was May Ramsey's son;

that he knew them well, and that the Los Angeles sheriff's office "had a case on the Ramseys." On October 19, 1956, Baker and Hicks talked with Sergeant Peterson of the Los Angeles sheriff's office, who told them that three weeks before he had had information from the Lynwood police department that a Miss Fields had made arrangements to be aborted in Orange County; that he and his partner followed her to Lakewood and Willow and that she was in a Buick which pulled into a service station at that location; that shortly thereafter a blue and white Ford drove up; that a woman, whom they identified as "Maw Ramsey," got out of the Ford, walked across to the Buick, and talked to the occupants; that she then got back in her car and both cars left in opposite directions; that he and his partner then went to Miss Fields' home, waited for her, and on her return, took her to the county hospital to be examined; that they obtained "a full statement from Miss Fields regarding being aborted in Orange county." She identified pictures of May Leola Ramsey and Milton G. Ramsey.

On October 22, 1956, Mr. Parkin, an investigator with the district attorney's office, told Baker that a "victim" had arrived at the Ramsey residence in a blue and white Ford and that she had left an hour later. On October 24, 1956, at approximately 10:30 a. m., Baker received a call from Parkin, who told him that the blue and white Ford had been driven into the driveway of the Ramsey residence with a woman he identified as May Ramsey, two younger girls, and a man he could not see well enough to identify. Baker then 'phoned Hicks and Sergeant Double of the sheriff's office and they, with several investigators and officers, a photographer, and a physician (Dr. Hayden) went to the West Street address. Baker used a key to open the front door and entered the house. In the doorway of the bedroom he met Milton Ramsey, who had on a dentist's or doctor's jacket. Baker pushed Ramsey into a room and saw therein a table with a woman lying on it, "her legs . . . her feet" were in stirrups, and May Ramsey was sitting at the end of the table and between the legs of the woman. There was a quantity of surgical equipment in the room, a chair near the end of the table with a white dishpan containing several instruments, a card table with syringes and "other medication" on it, a spotlight or flood-light, an electric suction pump, and hypodermic tubes and needles. The woman on the table had an aluminum instrument with a black rubber face mask tied to her wrists. Pictures

were taken by the photographer present and an examination of the woman on the table was made by Dr. Hayden.

Appellants were placed under arrest and when they arrived at the police station, Milton Ramsey said to Investigator Hays "You didn't have a search warrant and we will fight you on search, and if we don't beat you on the search, you have us dead." The record shows and it is admitted by the prosecution that the officers did not have a search warrant for the premises or a warrant of arrest for the appellants at the time of the arrest and search.

Following the arrest of appellants and their release on "high bail," they were again arrested on the charges set forth in information C-8756, filed on February 8, 1957. The record shows in this connection that on January 19, 1957, following a conversation with two deputies in the sheriff's office, Deputy Baker had a conversation with Melvin Heil, a reserve officer in the sheriff's office. In this conversation Mr. Heil told Baker that he had bought a house on Talbert Street and that upon inquiring who his neighbors would be, he discovered one to be Ramsey; that on January 17, at 11:30 a. m., he observed Milton Ramsey driving into the alley in a blue and white Ford. Ramsey and a young girl, appearing to be about 22 years of age, got out and walked into the house. At 12:45 p. m., Ramsey and the girl were observed leaving the premises and Heil saw the car driving out of the alley; that in his observations of the house it did not appear to Mr. Heil that anyone was living there. Heil further stated to Baker that on the 18th at 11:30 a. m., he saw a Plymouth and a 1955 Ford; that Milton Ramsey and a man left the Plymouth and went into the house. May Ramsey and a young girl left the Ford and also went into the house. When the girl left with Ramsey, it appeared that Ramsey was helping her into the car. Heil was shown a picture of Milton Ramsey and identified him as the driver of the Plymouth. On January 21st Heil told Deputy Baker that at about 4 p. m., a blue Ford arrived through the back alley; that Milton Ramsey got out of the car with a 15 or 16-year-old girl and a middle aged woman and they went into the house.

On January 21, 1957, Officer Baker, with other officers and Dr. Hayden, went to the Talbert Street address in a vehicle driven by Officer Heil. On arrival, Baker proceeded to the front door of the house. He used a key, but the door would not open "completely." He then put his shoulder to the door, smashed it in, and upon entering the house, observed

Milton Ramsey coming out of a lighted bedroom. He also observed May Ramsey, in a white nylon uniform, standing beside a young woman who was on a table in the room. Baker also saw a pan containing 11 instruments, immersed in a yellow fluid and another pan which contained eight instruments. Dr. Hayden, who entered at the same time, saw the girl lying on the table. An older woman was with her. He observed basins, a stool and card table, a goose neck lamp, suction apparatus and a pan containing instruments and hypodermic needles.

Since the only questions involved in this appeal are whether appellants were illegally arrested and whether the evidence obtained at the places of arrest was obtained as a result of an unlawful search, it is unnecessary to herein set forth the testimony of other witnesses for the prosecution received relevant to the commission of the offenses charged.

Section 836 of the Penal Code provides, in part, that a peace officer may arrest a person without a warrant (1) For a public offense committed or attempted in his presence; (2) When a person arrested has committed a felony, although not in his presence; (3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

In *People* v. *Boyles*, 45 Cal.2d 652, 655, 656 [290 P.2d 535], the defendant contended that to justify a search incident to arrest under subdivision 3 of section 836 of the Penal Code, there must be evidence, other than any turned up in the search, that a felony has in fact been committed. The court there said:

"Such evidence is present in any case in which the officer has reasonable cause to believe defendant guilty of a felony. When his belief of defendant's guilt is based on reasonable cause and a felony has in fact been committed, not only are the requirements of subdivision 3 satisfied, but a search incident to an arrest thereunder is reasonable. [Citations.] . . .

"It is settled, however, that reasonable cause to justify an arrest may consist of information obtained from others and is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citations.]" (See also *Willson* v. *Superior Court*, 46 Cal.2d 291, 294 [294 P.2d 36].)

In *People* v. *Brite*, 9 Cal.2d 666, 687 [72 P.2d 122], it is said that " 'Probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.' [Citations.]" (See also

*People* v. *Moore,* 140 Cal.App.2d 870, 872 [295 P.2d 969], in which it was held that a well-grounded belief is sufficient to lay the basis for a search without a warrant, and that the fact that the officers had plenty of time to obtain a warrant did not prevent their making the search, if reasonable.

In the instant case Deputies Baker and Hicks had reasonable cause, as herein defined, to arrest the appellants, to search the premises and seize evidence relating to the crimes charged. (*People* v. *Walters,* 148 Cal.App.2d 426, 431 [306 P.2d 606].) The information they received from the chief of police of Redwood City and on their visits to the premises; the facts revealed by a search of their records; the registration of the blue and white Ford; their observations of its operation; the conversation with Officer Peterson of the Los Angeles sheriff's office; and the information they received from Investigator Parkin were more than sufficient to establish reasonable cause and a reasonable belief that the appellants had committed, or were in the act of committing, an unlawful abortion at the times of the arrests.

The record shows that on October 24, 1956, at the time of the first arrest, Officer Baker opened the door of the house with a key, and at the time of the second arrest, he broke the door down. He did not first demand entrance or explain his purpose for entering on either of these occasions. Appellants argue that this was a violation of sections 841 and 844 of the Penal Code, which require that before an arrest is made by a peace officer, he must first demand admittance and then explain the purpose for which admission is desired.

However, in *People* v. *Maddox,* 46 Cal.2d 301, 305, 306 [294 P.2d 6], the court held that the requirements of section 841 of the Penal Code are analogous to the requirements of section 844; that if the officer has reasonable grounds to make an arrest, a violation of section 841 would be unrelated and collateral to the securing of evidence by a search incident to the arrest, for what the search turns up will in no way depend on whether the officer informed "the person to be arrested of the intention to arrest him, of the cause of the arrest and the authority to make it." It was further held that:

". . . [s]ince the officer's right to invade defendant's privacy clearly appears, there is no compelling need for strict compliance with the requirements of section 844 to protect basic constitutional guarantees. (*Cf. People* v. *Boyles, supra,* 45 Cal.2d 652, 656 [290 P.2d 535] ; *People* v. *Cahan, supra,* 44 Cal.2d 434, 442 [282 P.2d 905, 50 A.L.R.2d 513], footnote.)

We conclude therefore that when there is reasonable cause to make an arrest and search and the facts known to him before his entry are not inconsistent with a good faith belief on the part of the officer that compliance with section 844 is excused, his failure to comply with the formal requirements of that section does not justify the exclusion of the evidence he obtains.''

In the instant case it was reasonable for Baker and Hicks to assume that if they knocked on the door at the time of the first arrest, there would have been no opportunity to apprehend appellants in the act of performing an abortion, and further that the appellants would have an opportunity to escape or dispose of relevant evidence. At the time of the second arrest, Baker knew that defendant Milton Ramsey had been released on ''high bail'' and that he had previously been convicted of assault with intent to commit murder. Under the circumstances, we conclude that the entry in both cases was not unlawful.

The judgments are affirmed.

Barnard, P. J., and Waite, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 19, 1958. Carter, J., was of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.