[Crim. No. 7541. Second Dist., Div. One. Aug. 29, 1961.]

THE PEOPLE, Respondent, v. GEORGE D. KER et al., Appellants.

248

Matthews and Stanley for Appellants.

Stanley Mosk, Attorney General, and George W. Kell, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendants were charged with possession of marijuana in violation of section 11530, Health & Safety Code. A motion for dismissal under section 995, Penal Code, was denied; the following was offered on the issue of probable cause. Sergeant Cook, negotiating for the purchase of marijuana arranged to meet one Terrhagen around 7 p. m. on July 26, 1960. Terrhagen picked up Cook in his car and drove to a bowling alley which he entered; he returned in a few minutes and told Cook they were to meet the "connection" by the oil fields near Slauson and Fairfax Avenues; Terrhagen then pointed out a parked 1946 DeSoto as the "connection's" car. They drove to Slauson and Fairfax where Cook again saw the 1946 DeSoto; Terrhagen told Cook the "connection" had his supply of narcotics somewhere in the hills. They parked in the vicinity near some vacant fields; the DeSoto proceeding ahead of them made a U-turn and pulled alongside. Cook identified the driver as Roland Murphy, whom he knew from "mug" photographs and police information to be a large-scale seller of marijuana then out on bail on two

narcotic offenses. Terrhagen entered the DeSoto leaving Cook in the car; they proceeded north on Fairfax over the hill and into the oil fields out of Cook's sight and returned 15 minutes later. Murphy pulled up alongside the car in which Cook was waiting; Terrhagen entered carrying a kilo brick of marijuana. Murphy drove off northbound on Fairfax; Terrhagen drove home where he carved off of the kilo of marijuana a pound which Cook bought. Cook then relayed the foregoing information to Sergeant Warthen and Deputy Berman.

During all this time, Sergeant Warthen had Murphy under surveillance and observed the transaction with Cook; he also thereafter received from Cook direct information concerning it. The next day, July 27, 1960, Sergeant Warthen and Deputy Markman again took up surveillance of Murphy, starting at Murphy's home, following him in his 1946 DeSoto to the same bowling alley. He remained there 10 minutes, returned to the DeSoto and drove off; Sergeant Warthen tried to follow but lost him; Warthen then drove to the Slauson-Fairfax location where he had staked out the evening before and observed Cook, Murphy and Terrhagen. Seated in his car with the lights off, parked near some vacant fields a short distance away, they saw defendant Ker, whom they did not then know. They were not then interested in Ker; their prime interest was Murphy whom they suspected to be a large-scale marijuana seller and of whom they were conducting a narcotics investigation. Soon Murphy drove past in his DeSoto north on Fairfax; they tried to follow but lost him when he turned off his lights upon entering the oil fields. Shortly thereafter, Murphy returned, stopped behind Ker's automobile, got out, walked over to his car and appeared to talk to Ker. It was then between 8 and 9 p. m. Sergeant Warthen was about 1,000 feet away and observed them through glasses; soon Ker drove away. Sergeant Warthen followed but lost him when he made a U-turn in the middle of the block; however he obtained the license number of the car and a check disclosed it was registered to Douglas Ker at 4801 Slauson. Fifteen minutes later, Sergeant Warthen communicated the foregoing to Deputy Berman.

Since November 1959, Deputy Berman knew Ker as a narcotic suspect; he had received bits of information regarding him from "various persons"; he had been told Ker was selling marijuana from his home and he was possibly securing it from Ronald Murphy, alias "Ronnie" Murphy; in early 1960, he received a "mug" picture of Ker from the Inglewood

Police Department and until May 1960, continued to receive various bits of information about him. Between May and July 1960, Berman received information concerning Ker from one Black, a previous informant whose information Berman had used in other cases on at least three occasions resulting in arrests of two on forgery and one on narcotics and whose information Berman believed to be reliable; Black also supplied information to Berman relative to Murphy which had aided officers in their investigation of Murphy resulting in a complaint in the federal court which was then pending. Black had told Berman that Ker and others had bought quantities of marijuana from Murphy.

Acting upon the foregoing information and that relayed to him by Sergeants Cook and Warthen as hereinabove described, on July 27 between 9 and 10 p.m., shortly after Warthen had observed Murphy and Ker; Berman, Warthen and Deputy Love went to an apartment house at 4801 West Slauson Avenue; they first determined that Ker's car was parked behind the apartment house, ascertained that defendants lived in apartment 29 and were home, obtained a key from the manager so they would not have to break the door down, unlocked the door quietly so defendants would not hear their approach and attempt to destroy the evidence, and entered. The apartment had a kitchen, living room, bedroom and bathroom. Ker was seated in the living room; they identified themselves and told him they were conducting a narcotics investigation; simultaneously therewith, Ker's wife, Diane, walked from the kitchen into the living room; Berman identified himself to her and immediately walked to the kitchen door without entering; standing in the doorway Berman observed a small scale on top of the sink—on the scale was a brown paper package containing a 2-2/10-pound brick of marijuana (Exhibit 1); near it was a knife.

Defendants called Robert J. Black, presently serving time in Mira Loma, as their witness. He testified he had known them four and a half years but denied knowing anything connecting them with the narcotic traffic, and denied he ever made statements to that effect to Berman or any other police officer; he admitted having met Deputy Berman at the bowling alley.

The motion denied, the matter was tried before a jury. Evidence of Sergeant Warthen's surveillance of Murphy and Ker, and Berman's entry on the premises was presented to the jury. Continuing with his testimony, Deputy Berman, after walking

to the kitchen door and seeing the marijuana on the scales said to defendants: "What is this," defendants answered they did not know; Berman said, "It appears to be marijuana to me. It is yours?" defendants did not answer. Deputy Berman then arrested defendants and asked them "if they had any other narcotics or contraband in the apartment. They answered they did not." The officers then took defendants into the bedroom; there they saw a box containing ½ ounce of marijuana (Exhibit 2) atop a dresser; asked if it was theirs, defendants remained silent. Sergeant Warthen searched the kitchen and found in the cupboard a brown manila bag containing ½ ounce of marijuana (Exhibit 2); asked to whom it belonged, defendants remained silent. Warthen also saw in the kitchen a cup containing coffee, a partially eaten slice of toast and some silverware on the table, and a coffee pot on the drainboard close to the marijuana on the scales. Mrs. Ker told Warthen that she had been sitting at the table in the kitchen drinking coffee and eating toast, but had not looked in the direction of the marijuana. Sergeant Warthen then asked the defendants if they owned any other auto than the one parked in the back and which they had seen Ker driving; Ker said they did not; Mrs. Ker remained silent. Berman had information Mrs. Ker owned a car; around noon the next day he went to the car which was registered in the name of Diane Ker, searched it and found marijuana seed under the rear seat and a bag containing marijuana (Exhibit 3) in the dashboard compartment.

In his defense, Ker testified that he and his wife left the apartment at 7:30 p. m. to look for a new apartment, and returned at 10 p. m.; that before leaving he received a call from an unknown person and that a kitchen window had been tampered with in their absence. He denied prior knowledge or possession of the 2-pound brick of marijuana (Exhibit 1); admitted ownership of the box (Exhibit 2) but denied the marijuana in it was his; denied having met anyone during the period between 7:30 and 10 p. m., except Beswick whom they had visited; and admitted he knew Murphy but denied any rendezvous with him. Mrs. Ker corroborated her husband and denied prior knowledge of the marijuana (Exhibit 3) found in her automobile. Mr. Ker's father and mother and Mrs. Ker's mother corroborated defendants' testimony relative to the "suspicious circumstances" of the telephone call and the tampered kitchen window. Beswick testified defendants visited him that night in his apartment. The theory of

the defense was that while defendants were absent between 7:30 and 10 p. m. someone planted the marijuana in their apartment.

On rebuttal, Sergeant Keith of the Glendale Police Department testified to a conversation with Ker in 1957, wherein the latter told him he had smoked marijuana several times but got "no kick out of it"; that Ker saw marijuana, which was identified as such, at that time.

Inasmuch as the officers had no warrant, for the arrest of defendants to be valid the former must then have had reasonable cause to believe they had committed a felony. (Pen. Code, § 836, subd. 3; *People* v. *Bracamonte,* 194 Cal.App.2d 167 [15 Cal.Rptr. 54].) There being no formula for its determination, what constitutes "reasonable cause" depends upon the facts and circumstances of each case (*People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Wickliff,* 144 Cal.App.2d 207 [300 P.2d 749]; *People* v. *Hollins,* 173 Cal.App.2d 88 [343 P.2d 174])—the situation presented or apparent to the officers at the time they were required to act. (*People* v. *Evans,* 175 Cal.App.2d 274 [345 P.2d 947]; *People* v. *Hollins,* 173 Cal.App.2d 88 [343 P.2d 174]; *People* v. *Silvestri,* 150 Cal.App.2d 114 [309 P.2d 871]; *People* v. *Carella,* 191 Cal.App.2d 115 [12 Cal.Rptr. 446]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St. Rep. 73]; *People* v. *Murphy,* 173 Cal.App.2d 367 [343 P.2d 273].) The weight to be accorded the information possessed by the officers at the time they made the arrest is for the trial court in the exercise of its sound discretion. (*People* v. *Fisher,* 184 Cal.App.2d 308 [7 Cal.Rptr. 461]; *People* v. *Taylor,* 176 Cal.App.2d 46 [1 Cal.Rptr. 86]; *People* v. *Arter,* 169 Cal.App.2d 439 [337 P.2d 534]; *Lorenzen* v. *Superior Court,* 150 Cal.App.2d 506 [310 P.2d 180].) "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250]; *People* v. *Fischer,* 49 Cal.2d 442 [317 P.2d 967]; *People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73].)

Deputy Berman, since November 1959, knew of Ker from "various persons, bits of information," that Ker was possibly securing marijuana from Murphy and selling it from his residence; since early 1960, Berman knew what Ker looked like, and continued to receive "various bits of information"

up to May 1960. From Black, a reliable informer, Berman, between May and July 27, 1960, received information concerning Ker's activities and trafficking of marijuana and that Ker had purchased from Murphy. The night before the arrest Berman learned that Murphy, known to him as a large-scale marijuana seller, then out on bail in connection with several marijuana offenses, kept his narcotic supply in the oil fields near Fairfax and Slauson; Berman knew of the rendezvous between Murphy, Terrhagen and Cook, Murphy's furtive conduct, the location and time of the meeting and that Murphy had sold Cook one pound of marijuana. Immediately prior to the arrest Berman learned that Murphy in his DeSoto went to the same bowling alley, passed the same Slauson-Fairfax rendezvous where Ker was seated in his car at approximately the same location near the open fields at which Terrhagen and Cook had waited the night before, drove north on Fairfax into the oil fields in the same direction at about the same time of night, returned to Ker's car in the same fashion, left his automobile and talked to Ker. A check of the license number of the car Ker drove revealed his name and address. Immediately after ascertaining all of this information Berman and several officers proceeded to Ker's apartment where they arrested defendants with 2-2/10 pounds of marijuana in their possession. Viewing the information in the possession of the officers at the time they entered the premises and arrested defendant, we deem the same to have afforded them sufficient ground for the belief that Ker had just secured marijuana from Murphy and had it in his possession.

While the distance between Sergeant Warthen and Ker at Slauson and Fairfax prevented him from observing anything change hands between Ker and Murphy or hearing their conversation, it is a reasonable inference from what had occurred just prior thereto, the past repute, furtive conduct and activities of both Murphy and Ker, that Ker in the same fashion as Cook the night before had received from Murphy delivery of the same kind of merchandise (marijuana) and that Ker was returning with it to his home. Substantial circumstantial evidence destroys any merit to appellant's position that because the officers, by reason of distance and the time of night, observed nothing pass between Murphy and defendant, there existed no probable cause to believe he received marijuana and had it in his possession.

In *People* v. *Tahtinen,* 50 Cal.2d 127 [323 P.2d 442], the officers had prior information concerning the seller, Hernan-

des, but none concerning defendant. Hernandes, through the prior arrests of three persons, was known to the officers as a seller, doing business from his residence; officers saw defendant parked across the street from Hernandes' home, drive off, ride around and repark, walk into Hernandes' driveway, return to the alley, stop and appear to pick up an object at the base of a tree. They arrested him as he drove away and found heroin on his person and in his car. Defendant contended that the officer arrested him without reasonable cause to believe he had committed a felony; said the court: "This contention cannot be sustained. The information obtained from the three persons previously arrested gave the officers reasonable cause to believe the narcotics were being sold by Hernandes at his residence, and defendant's furtive conduct in the vicinity of Hernandes' house gave the officers reasonable cause to believe that defendant had purchased narcotics and had them in his possession" (p. 134). The case at bar is even stronger in that officers here had prior information concerning not only Murphy, the seller, but Ker the defendant.

■ ▪ While Diane Ker had not before been suspect, the evidence discloses something more than her "mere presence at the scene of a crime" (A.O.B., p. 20). Deputy Berman knew from Black that Ker was selling marijuana at his residence; it could be assumed that if Ker was married, particularly in view of the size of the apartment in which they lived together, that his wife was not entirely without knowledge of his unlawful activities. But more important, her conduct when the officers entered the apartment and her admitted prior occupancy of the kitchen wherein the marijuana was in plain sight made it obvious to the officers, even before they started their search, that she too was in the process of committing a felony (possession of marijuana). When the officers walked into the living room, Diane walked from the kitchen where the marijuana lay on the scale in the middle of the drainboard; she said she had been sitting at the table drinking coffee and eating toast; the coffee pot was on the drainboard very near the scale and marijuana. This lends little credit to her statement that she did not look in that direction or know the contraband was there.

■ Appellants say that the officers violated section 844, Penal Code, in entering their apartment without first demanding admittance or explaining the purpose of their visit. Under circumstances such as those at bar, where police officers at a

closed door have reason to believe that narcotics are to be had inside of the room and that if they do not enter quietly and/or in haste the narcotics will be destroyed by the occupants, they act reasonably when in an effort to surprise them the officers either gain entrance by stealth or force their way in. (*People* v. *Ramsey,* 157 Cal.App.2d 178 [320 P.2d 592]; *People* v. *Maddox,* 46 Cal.2d 301 [294 P.2d 6]; *People* v. *Ruiz,* 146 Cal.App.2d 630 [304 P.2d 175]; *People* v. *White,* 167 Cal. App.2d 794 [334 P.2d 963].) No two situations are identical. Each depends, for determination of reasonableness, upon its own facts. (*People* v. *Williams,* 175 Cal.App.2d 774 [1 Cal. Rptr. 44].) Deputy Berman's knowledge of Ker's prior activities, his information that Ker was a seller out of his residence and his knowledge of Ker's conduct during the previous hour, that someone was then in the apartment and Ker's car was parked behind the building, were sufficient circumstances to justify the reasonable belief that it was Ker who was in the apartment and that he had then a considerable amount of marijuana in his possession, and that warned in advance of the arrival of police he would have attempted to destroy the same. Quick and quiet police action was warranted; to have announced themselves and/or delayed entry, the officers would have provided Ker sufficient time within which to dispose of or destroy the narcotics. It was neither improper nor unreasonable for the officers to enter as they did.

Having had reasonable cause to believe Ker was in his apartment and had in his possession a substantial amount of marijuana, the officers believing he committed and was committing a felony, entered the premises for the purpose of arresting Ker. As they entered the living room and identified themselves, Mrs. Ker simultaneously walked from the kitchen to the living room at which time Deputy Berman walked several steps to the kitchen door without entering the kitchen. He saw in plain sight the marijuana on the scales. At this time no search had been made; Deputy Berman observed what was in plain view. (*People* v. *Roberts,* 182 Cal.App.2d 431 [6 Cal.Rptr. 161]; *People* v. *Quinn,* 194 Cal.App.2d 172 [14 Cal.Rptr. 814].) The search of the apartment did not take place until defendants had been arrested; a search incident to lawful arrest is not unlawful. (*People* v. *Winston,* 46 Cal.2d 151 [293 P.2d 40]; *People* v. *Montano,* 184 Cal.App. 2d 199 [7 Cal.Rptr. 307]; *People* v. *Quinn,* 194 Cal.App.2d 172 [14 Cal.Rptr. 814].)

In the light of the implied findings of the trial court in

its conclusion that probable cause existed, and the more than ample facts supporting the same; and the circumstances surrounding the entry, the finding of the marijuana and the subsequent search of defendant's apartment, the recent reference to *Mapp* v. *Ohio,* 364 U.S. 868 [81 S.Ct. 111, 6 L.Ed.2d 1081], does not justify a change in our original conclusion.

 Deputy Berman disclosed the identity of Black, but as to any other informant, the trial court permitted him to invoke the privilege of nondisclosure (Code Civ. Proc., § 1881, subd. 5). Thereafter, defendants made no motion to strike Berman's testimony, although they had ample opportunity to do so—after the officer invoked the privilege and before the issue was submitted, colloquy took place between the court and counsel, defendants put on Black as their witness and the motion was argued. ''A defendant cannot raise the problem of nondisclosure in the appellate courts when he . . . did not move to strike the testimony on a refusal to disclose. [Citations.]'' (*Priestly* v. *Superior Court,* 50 Cal. 2d 812, 819 [330 P.2d 39].) Appellants argue they are excused from making the motion because it was *then* obvious from the trial court's statement that it would not have been granted. But the record does not bear this out; it shows that the trial court did not make the statement which ''revealed its feeling about these informants'' (A.O.B., p. 15) until long after the motion could and should have been made, and after the issue of probable cause had been submitted. It was only then the court stated: ''I don't think its upon the—incumbent to furnish the name of the informers and I don't think it would have any real significance as far as their preparing the defense is concerned.''

 Citing *Priestly* v. *Superior Court,* 50 Cal.2d 812 [330 P.2d 39], appellants say the trial judge should have required Berman to reveal the names of other informants; we find no error here. The record discloses that the so-called ''informants'' referred to by appellants actually are the ''various persons'' who between November 1959, and May 1960, gave Berman ''various bits of information'' that Ker was suspect as selling marijuana he secured from Murphy, out of his home. Even appellants concede ''that the officer did not state he was relying upon the information given by others from November, 1959, to May, 1960, in making the search and arrest'' (A.O.B., p. 18); and, Berman testified he relied upon the information relayed to him by Sergeants Warthen and Cook, a ''mug'' picture from the Inglewood

Police Department, and information given to him by Black whose full name he revealed. Both Warthen and Berman denied, and the denial is nowhere controverted, that anyone had ever given them information that at the time of the arrest Ker had marijuana in his possession at his apartment. Nor does the testimony show that any of the "various persons" participated in the crime, were eyewitness nonparticipants, had anything to do with any of the events of July 26 or 27, were even in the vicinity or any of the locations at the times mentioned in the testimony, were present at the time and place of arrest, had ever pointed out Ker, his auto or his residence to the officers, or had even communicated with the officers since the first of May, 1960. Actually, the officers did not set out on July 27 to arrest Ker, they had no interest in him; their main concern was the "large-scale" seller, Murphy. They "stumbled" onto Ker in the process of their investigation of Murphy, and realizing, from what they knew of Murphy and had just seen occur between him and Ker, that Ker must have had a substantial amount of marijuana in his possession after leaving Murphy at Slauson and Fairfax, decided to arrest him before he was able to dispose of it. We fail to see under the circumstances hereinbefore described how the "bits of information" obtained from "various persons" so long before the arrest could be "relevant and helpful to the defense of the accused or essential to a fair determination of a cause" (*People* v. *McShann,* 50 Cal.2d 802, 808 [330 P.2d 33]); nor can we see any purpose at all useful to the defendants had these persons been brought into court. (*People* v. *Williams,* 175 Cal.App.2d 774 [1 Cal.Rptr. 44].) This situation does not fall within the purview of *Priestly* v. *Superior Court,* 50 Cal.2d 812 [330 P.2d 39].

Appellants' final contention goes to the sufficiency of the evidence to prove their dominion and control over the contraband and their knowledge of its presence and narcotic character. The case presents a direct conflict in the evidence. Defendants would have the jury believe they knew nothing about marijuana, that found in the apartment did not belong to them, they did not know it was there and some one must have planted it in their absence that night; but the jury, disbelieving the defendants and their witnesses, as it had a right to do, rejected their defense. (*People* v. *Stanciell,* 121 Cal.App.2d 798 [264 P.2d 576].) Thus, viewing the evidence in the light most favorable to the respondent, we find numerous incriminating circumstances revealing that the de-

fendants not only knew what marijuana was, but that the marijuana found in their apartment belonged to them.

We refer first to Ker. It is obvious that the officers had no intention of arresting Ker when they started their surveillance of Murphy on the evening of July 27; that it was Ker who met with Murphy was for the most part incidental to what the officers expected to find in an investigation of Murphy; and that no one knew in advance, must less the officers, that they would go to Ker's apartment between 9 and 10 p. m. to arrest him. Ker's association with Murphy only an hour before the former's arrest, his furtive meeting with Murphy at night in a fairly deserted location where the night before Murphy had sold marijuana to Cook after a similar trip into the oil fields, and his conversation with Murphy in a parked car without lights at the side of the road, constituted substantial circumstantial evidence that Ker then and there obtained marijuana from Murphy and thereafter had it in his possession; and this coupled with the presence shortly thereafter of a 2-pound brick of marijuana in his kitchen resting on a scale (on which it obviously had been weighed after its purchase), can leave only one reasonable conclusion—that Ker secured the 2-pound brick from Murphy and took it home to weigh it before disposing of it. And finally, Ker definitely knew about marijuana before—he had admitted to officer Keith in 1957, in the presence of marijuana that had been identified as such, that he had smoked it; Ker had small amounts of marijuana in other places in his apartment—the officers found some in a box on the dresser in defendants' only bedroom and in a sack in the kitchen cupboard; Ker made no denial of possession—he remained silent in the face of the officer's questions in the apartment concerning to whom the marijuana belonged; Ker's answer to Berman's question assumed Ker knew the substance was marijuana and that it belonged to him—Berman after discovering the 2-pound brick in the kitchen, asked him if he had "any other narcotics" in the apartment and Ker answered "that he did not"; Ker's lie to the officers when he denied that they owned any other vehicle than the one registered to him; and Ker's doubtful story on the stand that the marijuana had been planted in his apartment. The circumstances pointing to Mrs. Ker's guilty knowledge are as revealing. Two and two-tenths pounds of marijuana, which would make a large number of cigarettes (Berman testified that one ounce of marijuana yields from 40 to 60 cigarettes), obviously were not for the

Ker's own use, thus Ker, as the officers already knew, must have been peddling it from his apartment; it would be difficult to believe Diane Ker, as his wife, living with him in the small apartment, did not know of his unlawful activities therein and did not know the contraband was marijuana. According to her admission to the officers and their testimony, immediately prior to the officers' entry, she had been occupying the kitchen and drinking coffee at the table in very close proximity to the marijuana on the scale in plain sight, in fact when the officers entered the living room she walked into it directly from the kitchen. Other circumstances relate to her silence when asked about other small amounts of marijuana found in her apartment, her silence when asked if she owned a car, the discovery of marijuana in two places in a car registered to her, and her ridiculous statement (although she drank coffee in the kitchen and obviously poured it from a pot standing close to the marijuana on the scales) that she didn't look in that direction and did not know it was there.

■ ■ On the issue of joint possession, the court in *People* v. *Basco*, 121 Cal.App.2d 794 [264 P.2d 88], stated, "A person may be so closely interested in and connected with the unlawful possession of narcotics by another as to furnish support for a finding that there was a joint possession" (p. 796); and to show "knowing possession the conduct of the parties, admissions or contradictory statements and explanations are frequently sufficient. [Citations.]" (*People* v. *Foster*, 115 Cal.App.2d 866, 868 [253 P.2d 50]; *People* v. *Stanciell*, 121 Cal.App.2d 798 [264 P.2d 576].)

■ It is clear that the evidence and the reasonable inferences therefrom support the implied finding of the jury that both defendants had knowledge of and a joint dominion and control over the contraband found in their apartment and were thus guilty of possession. (*People* v. *Bagley*, 133 Cal. App.2d 481 [284 P.2d 36]; *People* v. *Hood*, 150 Cal.App.2d 197 [309 P.2d 856].)

For the foregoing reasons the judgment and order are affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied September 20, 1961, and appellants' petition for a hearing by the Supreme Court was denied October 25, 1961.