[Crim. No. 8812.    Second Dist., Div. One.    Nov. 5, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RUDOLPH GARCIA AVILA, Defendant and Appellant.

Louis L. Litwin, under appointment by the District Court of Appeal, and Litwin & Barouh for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction on a charge of violating section 11500, Health & Safety Code (unlawful possession of heroin).

In an information filed in Los Angeles County on August 15, 1962, appellant was charged with unlawfully possessing heroin on or about July 18, 1962. A jury trial was waived and appellant was found guilty as charged. A motion for a new trial was denied. Proceedings were instituted to commit appellant under section 6451 of the Penal Code and upon rejection thereof probation was denied and appellant was sentenced to the state prison for the term prescribed by law.

A résumé of some of the facts in this case is as follows: Officer Fesler, a thoroughly experienced narcotics officer of the Los Angeles Police Department (who had made hundreds of arrests, examinations and had testified many times as an expert witness in narcotic matters) started an investigation sometime in April 1962 which involved the appellant. The officer had received information from a person (to whom he referred as a reliable confidential informant) to the effect that an individual named Rex or Rudy was dealing in narcotics from an apartment at 177 North Toluca Street. Fesler reported this information to his superior officer and ascertained that another team of narcotics officers (Officers Sanchez and McCarvel) were conducting a narcotics investigation at that location. Fesler continued with his investigation of the persons at the named address and in the course of events saw Florence Morales, a known narcotics user, go to the location, get out of her car, go into the place and return to her car and then drive away. Fesler followed the automo-

bile for about 2 miles when it stopped. The officer then had a talk with the occupants of the car—Florence and Roberto Morales and Danny Gonzales. The officer examined the arms of each of the named occupants of the automobile and found that each of them was using narcotics. Each apparently readily admitted the use of narcotics but each denied being in or near the vicinity of 177 North Toluca Street.

Fesler then talked with the manager of the apartment house and she stated that there was an unusual amount of traffic going to and from the room occupied by the person referred to as Rex or Rudy and another male Mexican. She further stated that she was the person who had contacted officers Sanchez and McCarvel and that she was giving them information because she thought narcotics were being dealt with at the apartment; however, she did not want to become involved. The manager described to Fesler the person known as Rex or Rudy as "a real light complected Mexican or possibly Caucasian" that he "had brown wavy hair and was approximately 30 to 32 years old, approximately 5 feet 6 inches" in height "and rather stocky." That description met with the description which the officer already had. The manager was requested to secure the license numbers of the automobiles which were driven to the apartment by persons going to and from the apartment in question. A red Fiat car registered to Alan Cooper (a known narcotics user) was frequently there and Cooper called daily and sometimes twice a day. She also gave the officer the number of a Ford car which was frequently driven there by a male Mexican with a female Mexican companion. Apparently the number of that car was traced to a person known on Temple Street as Bochise and the girl with him was identified from police record bureau photographs as being Mary Kemp. Mary Kemp was a known user of narcotics with a long police record. There were numerous other known narcotics users (including Adolph Nagreedy and Joyce Nagreedy) who were identified as being frequent visitors to the Rex or Rudy apartment. Some few days later the manager called Fesler and told him that the occupants of the apartment in question had moved out.

Further investigation revealed that Rex or Rudy had gone to the "east side and was staying with his folks." Later on, information from a reliable confidential source came to Fesler to the effect that Rex or Rudy was again dealing in narcotics but that he infrequently came to the Temple Street area. On the date of the arrest, July 18, 1962, Fesler received informa-

tion from a confidential and reliable source that Rex or Rudy was living in an apartment located at the corner of Cambria Street and Union Avenue, and that two Mexican girls (one with red hair and one with black hair) had just gone there to "score." It was understood that the customers of Rex or Rudy would enter the rear of the apartment building from the Cambria Street side. Fesler went to the apartment house and found a rear entrance. He talked with the manager of the apartment house and was shown her books. He noticed from the books that Alan Cooper was registered as being in room 305—he recalled that Alan Cooper was one of the persons who had been a daily visitor at Rex or Rudy's apartment on Toluca Street. The manager stated that Cooper had been there only a short time, that he did not live there alone, that he lived with a "real light complected person, she thought was a Mexican; and that he had brown wavy hair, was about 27 to 30 years old, about 5'6", and rather stocky." Thus, Fesler immediately connected Rex or Rudy of the North Toluca address with the description which he had just received (which description is substantially the same as that given by the manager of the Toluca address which Fesler already had).

Fesler asked for and received permission from the manager of the apartment house to use a vacant apartment close by 305, to the end that he could watch what went on in the vicinity. A short time afterward Fesler talked with the manager again and inquired if the occupants of 305 received any telephone calls and the manager stated that they did receive quite a few calls—that the procedure was for her to answer the telephone and when a call was for an occupant of 305 she would give a buzzer signal to room 305 and then someone would come to the telephone in the hallway on the third floor. The manager was asked to place a call from her apartment (from her private telephone) to the telephone on the third floor—room 305—and she indicated that she would do so. Fesler took a position around the corner from the telephone, he heard the telephone bell ring and then heard a buzzer sound from the area of room 305 and shortly thereafter a door opened and he heard footsteps in the hallway coming in the direction of the telephone. When the footsteps stopped in the area of the telephone, Fesler stepped out and was confronted by a male Caucasian about 60 years of age and two female companions. Fesler identified himself as a police officer and asked the man which room he had come from and the man

answered, "what do you want to know for?" One of the women companions looked at Fesler's badge and said "Oh, you want room 305" and pointed down the hall toward the room numbered 305. As she so pointed a female Mexican with red hair stuck her head out of the door of 305 and looked in the direction of the officer. Fesler recognized her as a known narcotics user by the name of Claudette Ponci although she had also used the name of Becknel. Upon seeing the officer she immediately withdrew into the room and slammed the door shut. Fesler ran to the door and entered the apartment. He did so because he was of the opinion that there were narcotics in the room "and that they were about to be destroyed." Upon entering the apartment he saw two girls on the bed (one being Claudette Ponci and the other her sister Gloria Becknel). On the dresser there was a medicine dropper with a hypodermic needle attached to it. Both girls were placed under arrest; the arms of each of them bore numerous hypodermic injection marks and further each of them was "going through withdrawal symptoms from narcotics." The women stated that a person known to them as Rex lived in the apartment but that he had gone possibly "to the unemployment office." Further search was made of the apartment and a number of balloons and a box of empty number 5 gelatin capsules were found. Those items are commonly used to package narcotics for sale.

About 1 p.m. there was a knock at the door. Upon opening it Fesler admitted Adolph Nagreedy, a person known to Fesler as a narcotics user and peddler (and one who had frequented the Toluca apartment). At about 1:50 p.m. there was a noise at the rear door and a person called out the name "Rex" and then the name "Rudy." Fesler opened the door and appellant walked in carrying a bag of groceries. Fesler asked him what his name was and he answered Rudy Avila and stated that he lived there. The groceries he was carrying were put down in the kitchen and Avila walked into the front room. The officer saw hypodermic marks on Avila's arms and in answer to a question Avila stated that he was a user of narcotics. Appellant was then placed under arrest for the possession of the hypodermic needle. Fesler's officer partner Magda was in the kitchen examining the grocery sack and its contents and withdrew therefrom a package which contained 5.2 grams of heroin. Avila stated he had purchased the heroin from a "white guy" at Brooklyn and Ford streets for $60. He further stated that the hypodermic needle and

syringe found on the dresser belonged to him. There was no evidence of any kind to contradict in any way that which was presented by the prosecution.

The main question raised by the appellant is whether there was probable cause for Fesler to believe that a crime was being committed in room 305 and that therefore he could enter the apartment and make an arrest under the circumstances. Appellant also asserts that the trial court was in error in ruling to the effect that the identity of the informant need not be disclosed. Here the facts are clear that an informant did point a finger of suspicion toward appellant which caused Fesler to suspect appellant. However that may be, the informant played no part in the criminal acts with which we are concerned—he was no feigned accomplice, he was no witness to any part of the transactions with which we are concerned. It was not the informer's statements that caused Fesler to enter the apartment—to the contrary it was what Fesler himself saw and knew of his own knowledge and the information he had secured from the manager of the apartment which led him to believe that narcotics were about to be destroyed in the apartment unless he acted quickly. The arrest was valid quite apart from anything any informant had told him. There is nothing in this case which leads to the conclusion that had the identity of the informant been revealed and had he been called as a witness, he might have said or refused to say anything which would have in the slightest made any difference in the search, seizure, arrest or prosecution of the case. (*People* v. *Lawrence,* 149 Cal·App.2d 435, 450 [308 P.2d 821] ; *People* v. *McMurray,* 171 Cal.App. 2d 178, 183 [340 P.2d 335] ; *People* v. *Williams,* 175 Cal.App. 2d 774, 776-777 [1 Cal.Rptr. 44].)

The furtive conduct upon the part of a known narcotics user (that of the young lady, a known narcotics user with a long police record, opening and then suddenly slamming the door upon seeing the officer) at the room of a known narcotics peddler and user would seem to be enough to alert any worthwhile narcotics officer to the fact that the probability was great that unless he was very fast and acted quickly the evidence of a narcotics offense would be very shortly out of his reach. (*People* v. *McCottry,* 205 Cal.App.2d 698, 703 [23 Cal.Rptr. 309] ; *People* v. *Tahtinen,* 50 Cal.2d 127, 134 [323 P.2d 442] ; *People* v. *Ker,* 195 Cal.App.2d 246, 254 [15 Cal. Rptr. 767].)

It is a common thing for narcotics violators to dispose of

the evidence quickly once they know they have been detected. The girl in this instance had every reason to believe that she had been so detected. (*People* v. *Sayles,* 140 Cal.App.2d 657, 660 [295 P.2d 579]; *People* v. *Maddox,* 46 Cal.2d 301, 306 [294 P.2d 6].)

█ Reasonable cause is shown when under the facts of the particular case a man of ordinary care and prudence, knowing what the arresting officer knows, would believe or entertain a strong suspicion that the person is guilty.

█ The trial court held and properly so that the officers in this case acted reasonably and properly under the circumstances.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 30, 1963.