[Crim. No. 6968. Second Dist., Div. Three. Aug. 26, 1960.]

THE PEOPLE, Respondent, v. DANIEL C. MONTANO, Appellant.

David C. Marcus for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

FORD, J. — The appellant, Daniel C. Montano, and Yvonne Jimenez were accused by an information of the crime of possession of heroin in violation of section 11500 of the Health and Safety Code.[1] The appellant duly waived his right to trial by jury. He was found guilty and, his motion for a new trial having been denied, he was sentenced to imprisonment in the state prison for the term prescribed by law. He appeals from the judgment and from the denial of his motion for a new trial.

The appellant's contentions are that the narcotics should not have been received in evidence because "there was not reasonable or probable cause to break in, enter and search the premises in question without a search warrant or warrant of arrest," and that his confession should not have been received in evidence because of the "psychological and coercive" tactics of the officers by which it was obtained. He asserts that the obtaining and use of the confession violated

---

[1] The information was set aside as to Yvonne Jimenez upon her motion which was made under the provisions of section 995, Penal Code.

his rights under both the Constitution of the United States and the Constitution of the State of California.

The factual basis upon which the appellant relies for his claim that evidence was obtained as the result of an illegal search and seizure will be summarized. James Grennan, a police officer for the city of Los Angeles, testified that on April 3, 1959, about 12:30 p. m., he and Sergeant Hanks undertook to observe the premises at 206 South Dakota Street, Los Angeles. There was at that address a one-family dwelling. The observation was made while the officers were in an automobile which was parked in a driveway about a block away. After about an hour or an hour and a half, the witness saw Nicholas Villafuerte turn from Second Street and walk south to the premises which were being watched. The officer had previously arrested Villafuerte for possession of heroin and had known him to be a narcotic addict. Villafuerte went toward the house and passed from the officer's sight when he was on the front porch. The doorway faced north and the witness could not definitely say from his own knowledge that Villafuerte entered the house. The officers then drove to the intersection of Second and Fresno and were parked at the north curb of Second Street, facing in a westerly direction. About 15 minutes after Villafuerte had disappeared from sight, the witness again observed him as he walked in a northerly direction on Dakota Street and turned in an easterly direction on Second Street. Villafuerte went to the north side of Second Street. He stood in the parkway and made a motion with his left hand ''from an east to westerly direction.'' A vehicle which had been parked several vehicles in front of the officers' vehicle started up from the curb and Villafuerte entered it. The officers stopped that automobile and obtained 130 capsules of heroin. Villafuerte denied any knowledge of having had heroin in his possession. Officer Grennan talked to Villafuerte's companion, Luis Lora. Lora stated that when he first started driving Villafuerte to the location, he had not known that Villafuerte was going to ''score,'' but when he saw how things turned out, he was aware that Villafuerte had gone to ''score'' for some heroin. The officer testified that ''score,'' in the jargon of the narcotics user, means to buy some heroin. Villafuerte and Lora were placed under arrest and taken to the police station. At about 3 p. m., the officers went to the residence at 206 South Dakota. Officer Grennan entered the front door and went to the rear where he could see the appellant standing

in the kitchen. He walked up to the appellant, identified himself as a police officer, and told him he was under arrest. He had no search warrant or warrant for the appellant's arrest. The officer told the appellant that he knew he was in possession of heroin in his house and, if he told the officer where it was, it would save the officers a lot of trouble "looking for it." After a few moments, the appellant said, "You'll find the heroin in the bedroom." In one of the bureau drawers in the bedroom, the officer found a quantity of gelatin capsules which contained a white powder resembling heroin.

The officer further testified that before the day in question he had had the residence under observation for a week or two weeks. On March 24, he had seen Billie Pampa enter the house where he remained about 15 minutes. Pampa had, to the knowledge of the officer, been arrested for possession of marijuana and heroin. On cross-examination, the witness said he had never met Pampa but as far back as the previous September he had had Pampa's residence under observation. He was not positive that Pampa had been arrested for a narcotics violation prior to the arrest of the appellant but he believed that he had. On April 3, the observation of the officers from a point about 150 yards way from the house at 206 South Dakota Street was made by means of field glasses. There was a large tree in front of that house. At that time, the officer had known Villafuerte about a month, having met him on the occasion when he had arrested him for possession of heroin. His case had been dismissed prior to April 3. On April 3, the officer found no narcotics on Villafuerte's person but narcotics were found in the roadway. Villafuerte said that he had been at 206 South Dakota Street to visit Martha. The officer later met Martha at the house there located. When he was accused of just having "scored off Danny," Villafuerte stated, "I didn't score off anybody." When the officer returned to the premises at 3 p. m., his purpose was to arrest the appellant. The officer testified further as to his conversation with Lora and said: "He stated that when Nick left the car and went in the house, or rather, when he left his car he did not have anything in his hands, but when he come [sic] back and got in the car, he had a large quantity of narcotics in his hands. He said it was the most amount of narcotics he had ever seen." The officer said that as Lora's car proceeded in a westerly direction, he "observed these objects being thrown out of the right side of the automobile." On April 3, the officer did not see

the appellant enter the premises and did not know he was there, but he had seen him enter and leave on numerous prior occasions.

In *People* v. *Gorg,* 157 Cal.App.2d 515 [321 P.2d 143], the applicable law with respect to an arrest, such as the one of which the appellant complains, is thus stated at page 519: "Whether the arrest was a legal one, since it was accomplished without a warrant of arrest, depends upon whether or not the police had reasonable cause to believe that appellant was committing or had committed a felony. (*People* v. *Simon,* 45 Cal.2d 645 [290 P.2d 531]; *People* v. *Cannon,* 148 Cal.App.2d 163 [306 P.2d 589].) Reasonable or probable cause is such a state of facts as would lead a man of ordinary caution and prudence to believe, and conscientiously to entertain a strong suspicion that the person accused is guilty. (*People* v. *Soto,* 144 Cal.App.2d 294 [301 P.2d 45].) Reasonable cause to justify an arrest may consist of information obtained from others and is not limited to evidence that would be admissible at the trial on the issue of guilt. (*People* v. *Boyles,* 45 Cal.2d 652 [290 P.2d 535]; *People* v. *Cannon,* 148 Cal.App.2d 163 [306 P.2d 589].)" (See also *People* v. *McMurray,* 171 Cal.App.2d 178, 184 [340 P.2d 335].)

. The evidence discloses that the officers had had the house on Dakota Street under surveillance for some time. While Officer Grennan did not see the appellant enter the premises on April 3, he had seen him enter and leave on numerous prior occasions. On one occasion, the officer saw Pampa, whom the officer believed to be associated with narcotic activities, enter the house. On April 3, he saw Villafuerte go onto the premises. The officer had previously arrested Villafuerte for possession of heroin and had known him to be a narcotic addict. When Villafuerte left the premises and went to Lora's automobile, the officer saw Villafuerte throw objects from the automobile, apparently when he became aware of the presence of the officer. These objects contained what appeared to be heroin. The officer arrested Lora and Villafuerte. The conversations with those two men were properly received in evidence because they constituted part of the information upon the basis of which the officers acted. As stated in *People* v. *Boyles,* 45 Cal.2d 652, at page 656 [290 P.2d 535] : "Since the court and not the officer must make the determination whether the officer's belief is based upon reasonable cause, the officer must testify to the

facts or information known to him on which his belief is based." Information is not to be excluded from consideration because of the fact that it is hearsay. (*People* v. *Hood,* 150 Cal.App.2d 197, 200 [309 P.2d 856]; *People* v. *Easley,* 148 Cal.App.2d 565, 568 [307 P.2d 10].) It was a reasonable inference from what had occurred that Villafuerte had obtained narcotics in the premises at 206 South Dakota Street. The information thus possessed by the officers was such as would lead a man of ordinary caution and prudence to believe, and conscientiously to entertain a strong suspicion, that the appellant was in possession of narcotics. The state of facts as known to them constituted reasonable cause sufficient to warrant the arrest and search. (*People* v. *Gorg, supra,* 157 Cal.App.2d 515, 520; see *People* v. *Maddox,* 46 Cal.2d 301, 304 [294 P.2d 6].)

 The appellant cannot complain that the officers entered the house without having made a demand for admittance and given an explanation of the purpose for which admittance was desired. It appears to have been probable that if such had been done, incriminating evidence would have been destroyed. (See *People* v. *Maddox, supra,* 46 Cal.2d 301, 304-306; *People* v. *Shelton,* 151 Cal.App.2d 587, 588 [311 P.2d 859]; *People* v. *Sayles,* 140 Cal.App.2d 657, 661 [295 P.2d 579].) The search thereafter made without a warrant was valid since it was incidental to a lawful arrest and was reasonable and made in good faith. (*People* v. *Winston,* 46 Cal.2d 151, 162 [293 P.2d 40].)

 Even though the officers might have procured a search warrant, the appellant cannot complain. The relevant test is not whether it was reasonable to procure a search warrant, but whether the search was reasonable. (*People* v. *Winston, supra,* 46 Cal.2d 151, 162-163; *People* v. *Sayles, supra,* 140 Cal.App. 2d 657, 660.)

 The testimony bearing upon the issue of whether there was lack of the required voluntary character with respect to statements made by the appellant will now be stated in summary form. After Officer Grennan had given testimony to the effect that the appellant's statements at the house were freely made, at the request of counsel for the appellant a ruling on their competency was reserved until a later time in the trial. Officer Grennan then testified as follows: "I asked the defendant whose stuff it was, and he said it was his. I asked him where he had obtained it, and he wouldn't say where he had obtained it. He said he had bought it in loose form, he had

paid a hundred and twenty-five dollars for it, and he had put the powder in the capsule form himself. He stated he did not sell heroin, that it was for his own use. I then asked him to let me examine his eyes and his arms, and his nostrils, which he did, and at the conclusion of which I told him that— . . . (Continuing) At the conclusion of these examinations, I told him that he was a liar, that he did not use narcotics, there was no evidence in the physical examination that would indicate that he was using narcotics in the amount that he claimed. He claimed he would empty ten capsules at a time, and sniff them up his nostrils. . . . He said yes, Nick had been there in the house, but he had not sold Nick anything.''

Officer Hanks testified that at approximately 5 p.m. on April 3, he had a conversation with the appellant at the police building and that the statements of the appellant were made voluntarily. Evidence of the conversation was admitted subject to a motion to strike, the procedure being that requested by the counsel for the appellant. Officer Hanks testified, in part, as follows: ''He stated that he had purchased fourteen grams of heroin, I believe he said several weeks before, from a person whom he declined to reveal to us, that the fourteen grams was represented by what we found. He stated he was not living there on Dakota, but he had stayed there the night prior to the arrest, and that he had capped up some of the capsules at that location the morning of the arrest. He stated that he was not selling, that he was using heroin, he sniffed it, that the last time he sniffed had been two or three days prior when he had sniffed nine or ten caps. He stated he did not sell any narcotics to this Nick. He did acknowledge that Nick had been there prior to our arrival. Q. At any time during the conversation did you ask him how much he had paid for the fourteen grams he purchased? A. Yes. Q. What did he say about that, if anything? A. He stated he had paid $125.00 for it.''

At the premises while the officers were there was Yvonne Jiminez who had recently given birth to a baby. The appellant was the father of the child. The child was in the house. Martha Montano, the appellant's sister-in-law, returned to the house after the officers had entered. She was in a late stage of pregnancy. Yvonne was arrested and taken to the police station but Martha was not. Officer Grennan testified, on cross-examination, that the appellant was concerned over Yvonne going to jail and asked him not to take her to jail. The officer told the appellant that ''the stuff was in her bedroom in her

dresser drawer.'' The officer further said: ''She had stated that she knew what it was, she had seen him cutting it up and packaging it on the front room table in the front room.''[2] He told Yvonne that she was under arrest.

Yvonne Jimenez was called as a witness on behalf of the appellant. She testified that on April 3, four officers entered the house, two from the front and two from the rear of the house. She became hysterical. They searched the house. It was 45 minutes to an hour before they said that they had found anything. She further said: ''They asked Danny if he would say it was his they wouldn't take Martha or I, they wouldn't touch us at all, and so Danny said, 'Well, that's mine. You leave the girls go.' 'Okay.' And they still took me. 'Come on, let's go.' '' She further testified: ''I just remember that one of them said they were going to take my baby away from me if Danny didn't say it was his, or they wouldn't take anybody if Danny said it was his, so Danny said, 'All right. I'll cop out to it. It's mine. And you will let the girls go all right?' And that's when they told me, 'You have got to go, too, Yvonne.' ''

Martha Montano was called as a witness by the appellant. A portion of her testimony was as follows: ''Q. Then when they found the stuff was there, then they had a conversation with Danny concerning the narcotics? A. Well, he admitted —— no. They said, 'We found it. Now admit it. We know it's yours.' That's when they said, 'We know it's not theirs. We know it's yours.' Q. Who did they say that to? A. Danny. Q. Then was there any conversation about you girls being taken into custody, taken down to jail? A. Well, yeah. They said that they would have to take us all, because it was our house, and Danny says that, 'They don't know nothing about it,' and neither did he. Then he says —— then after he said that he really didn't know anything about it —— Q. Did the officers at any time state that they were going to take all three of you in? A. Well, Hanks said that they would have to take us— he is the only one that told me. He said, 'We will have to take you all in, because it is your house.' Q. Was anything said by any of the officers that if Danny admitted or copped out to it they would not take you? A. Well, they said that—you know, if they had his confession, I guess, that they wouldn't have to take us. Q. Then what did Danny say after that? A. Well, he told them it was his.''

The appellant testified in his own behalf. He did not live

---

[2] It is not clear from the record whether this portion of the officer's testimony relates to what the officer told appellant.

on the premises, but Martha Montano and Yvonne Jimenez did on April 3. He was there visiting with Yvonne and the baby. A portion of his testimony was: "Q. When he came out with this package in his hand and says, 'Look what I found,' what else did he say and what did you say? A. Well, he says, 'Well, now that I found it, all of your people are going to jail.' And he told my sister-in-law, 'I sure hate to see you have a baby in jail.' And I says, 'You don't have to come in here. If you want to convict anybody, take me. It belongs to me. Leave them here.' And he says, 'Are you going to cop out to it?' And I says, 'Yes, I'll say it's mine.' . . . Q. Now, sir, we know you said that you did cop out to it. Was it true that the narcotics was yours? A. No, it wasn't. Q. Why did you tell the officers that you would cop out? A. Because I didn't want my sister-in-law to have a miscarriage, or possibly have a miscarriage, or take the chance of her losing the baby in jail, because it was my brother, and I like my sister-in-law, I respect her, and I couldn't let that happen to her. And Yvonne felt the same way—thought the same way. But it was my baby, and I have to protect my baby, whether she is legally my wife or not. It is still my baby. And I explained that to my wife, too, that if she was in her place I would do the same thing, because why shouldn't I do it for my baby. Q. Was this your narcotics? A. No, it wasn't my narcotics. Q. When was the first time that you knew that there was narcotics in that house? A. About forty-five minutes to an hour after they were there." As to what occurred at the police station, he testified as follows: "Q. Now, when you got to the station, did they interrogate you? A. Yes, they did. They told me that if I would go ahead and say it was mine, that they would let Yvonne go there at the station. So at that time I turned around and I told Yvonne, I says, 'You agree with them, whatever they say, because I want you to go back to the baby, and because after all this upset Martha might have hers tonight, or any time now.' And I wanted her to get back to the baby, and I didn't want her parents to find out exactly what had been going on at that time, because I myself was too confused to grasp it all in. Q. All right. Now, they took your name there, did they? A. Yes. Q. And at that time you copped out to it or admitted it? A. Yes, I agreed with them, because I figured that as long as they were going to go ahead and press charges, the sooner I could go and get out of there and defend myself." He further testified: "Q. Was it because of your mental condition at the time, because you were worried about your sister-in-law

and your lady friend, that caused you to take the blame for it?
A. Yes."

In rebuttal, Officer Barber testified in part as follows: "Sergeant Grennan at that time told him we were going to search, and that it would be easier—I don't know his exact words—but that it would be better if he would just show us where the stuff was. We knew it was here. We were going to find it. And we talked in the kitchen for a few minutes. The exact words I don't know, but it was that type of— we were going to search the house, and we will find the narcotics; 'it would be better if you show us where it is.' At that time he said he would, and he walked with Grennan and myself into the bedroom that was adjoining the kitchen, as I recall, and the other young lady with the baby was in the bedroom at that time, and he went to the dresser and pointed to the dresser, a certain dresser drawer—I believe it was the second dresser drawer. Sergeant Grennan opened the drawer, and he pointed to the narcotics, and Sergeant Grennan picked it up and handed it to me. Q. At any time while you were there in that house, did you or any other officer in your hearing tell this defendant that if he copped out, you would not arrest either one of the two girls, or that you would just make a cursory booking of either one of the two girls? A. No, sir. Q. Was there any promise of immunity made to this defendant at any time by any officer or yourself in your presence? A. No, sir. Q. Did anybody tell him it would go easier with him or easier on anybody else for any statement he made while you were there in that house? A. No, sir."

Upon completion of the evidence bearing upon the issue and after argument of counsel, the trial court made its ruling that the statements of the appellant had been voluntarily made and were admissible in evidence.

█ "The use of a confession, obtained by either physical or psychological coercion as a means of obtaining a finding or a verdict of guilt, constitutes a violation of the due process clauses of the United States and state Constitutions." (*People* v. *Speaks,* 156 Cal.App.2d 25, 36 [319 P.2d 709], in which leading cases are noted in footnote 4.) █ Before a confession is admissible, the prosecution must sustain the burden of proof that it was voluntary. (*People* v. *Berve,* 51 Cal.2d 286, 291 [332 P.2d 97]; *People* v. *Speaks, supra,* 156 Cal. App.2d 25, 36.) █ As stated in the Speaks case, at page 37: "The requisite of voluntariness of a confession is not satisfied by establishing merely that the confession was

210

not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was voluntarily made. (*Ziang Sung Wan* v. *United States,* 266 U.S. 1 [45 S.Ct. 1, 69 L.Ed. 131, 148].) ▆ To be free and voluntary, it must not be produced by hope or fear, or by the exertion of any improper influence. (*Bram* v. *United States,* 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568, 573] ; *Turner* v. *Pennsylvania,* 338 U.S. 62 [69 S.Ct. 1352, 1357, 93 L.Ed. 1810, 1813].)''

▆ Where a confession is coerced by a threat to arrest a near relative, it is not admissible. (*People* v. *Matlock,* 51 Cal.2d 682, 697 [336 P.2d 505] ; *People* v. *Shelton, supra,* 151 Cal.App.2d 587, 588; *People* v. *Mellus,* 134 Cal.App. 219, 225 [25 P.2d 237].) ▆ But, as this court said in *People* v. *Abbott,* 156 Cal.App.2d 601, at page 605 [319 P.2d 664] : ''The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary.''

▆ In the present case, there was a conflict in the evidence. The testimony of the officers was such that the trial court could reasonably infer therefrom that the statements of the defendant were made voluntarily. The principle governing such a case was stated by Mr. Justice McComb in *People* v. *Dolan,* 38 Cal.App.2d 96, at page 98 [100 P.2d 791] : ''There was thus a conflict of evidence as to whether the confessions had been freely and voluntarily made, the determination of which question lay in the sound discretion of the trial judge; and, being supported by substantial evidence, his finding that the confessions were not obtained by force or coercion is binding upon this court. (*People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863].)'' (See also *People* v. *Matlock, supra,* 51 Cal.2d 682, 697-698; *People* v. *Hinton,* 166 Cal.App.2d 743, 747-748 [333 P.2d 822] ; *People* v. *McLaughlin,* 156 Cal.App.2d 291, 296 [319 P.2d 365].) Accordingly, we find no error in the admission of the statements of the appellant.

The judgment and the order denying the motion of the appellant for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.