[Crim. No. 18711. In Bank. Mar. 12, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CHERYL LYNN STEGER, Defendant and Appellant.

542

## COUNSEL

Volney F. Morin, Volney F. Morin, Jr., and Sandra S. Sawyer for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Jack T. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant Cheryl Lynn Steger appeals from a judgment convicting her of the first degree murder of her three-year-old step-daughter Kristen. She·contends, inter alia, that the evidence at her trial

was insufficient to justify a jury instruction on murder by means of torture. The contention is meritorious.

Kristen died from head injuries. Viewed in the light most favorable to the People, the evidence discloses the fatal injury, a subdural hemorrhage covering almost the entire left half of the brain, was undoubtedly caused by trauma. The child's body was also covered from head to toe with cuts, bruises and other injuries, most of which could only have been caused by severe blows. Among the injuries were hemorrhaging of the liver, adrenal gland, intestines, and diaphragm; a laceration of the chin; and fractures of the left cheek bone and right forearm. Medical evidence revealed that most of the injuries were inflicted at different times in the last month of Kristen's life. Defendant failed to seek medical help for the injuries.

Defendant's own statements provided much of the case against her. In testimony she admitted she was continually frustrated by her inability to control Kristen's behavior. The child would wet her pants, stick her tongue out, and generally disobey. To effect discipline, defendant beat Kristen on the buttocks with a belt and a shoe. The beatings were inflicted daily for the final week of the youngster's abbreviated life. Defendant admitted striking Kristen on the back and twice punching her in the arm, causing her to fall down and hit her head on the floor.

Defendant also told the police in a written statement that on the day before the death, she hit Kristen on the shoulder, knocking her down; she pushed her, banging her head against a wall; and she struck her on the side of the head. Moreover, she orally told an officer, "I want to make a full confession. I want you to know that I did it. I beat her."

Section 189 of the Penal Code provides in relevant part: "All murder which is perpetrated by means of . . . torture, or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree . . . ."

Three decades ago, this court strictly construed the definition of torture in section 189. In *People* v. *Heslen* (Cal. 1945) 163 P.2d 21, 27, modified (1946) 27 Cal.2d 520 [165 P.2d 250], we said: "Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering,

the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide."

This restrictive definition of torture was reemphasized in *People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]: "In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death."

As will be shown below, we have consistently followed this strict construction of torture in cases applying section 189. However, a few Courts of Appeal, in cases somewhat similar to the present, have upheld torture murder convictions by liberally construing the *Heslen* and *Tubby* holdings.[1] These courts have inferred the presence of "specific intent to cause cruel suffering" almost exclusively from the severity of the wounds on the victim's body. For example, the court in *People* v. *Misquez* (1957) *supra,* 152 Cal.App.2d 471, 480, reasoned, "The brutal and revolting manner in which defendant mistreated the child leads inevitably to the conclusion that he intended to cause cruel pain and suffering." To determine whether such a liberal construction of *Heslen* and *Tubby* is permissible we must examine how torture fits into the scheme of first degree murder in California.

Murder, the unlawful killing of another human being with malice aforethought, is undoubtedly one of the most heinous crimes that can be committed in a civilized society. Given the gravity of the act, it may not be readily apparent why the law should distinguish between degrees of murder. In fact, the early common law made no distinctions: murder, regardless of its characteristics, was punished with death. (1 Warren on Homicide (1914) § 77, p. 353.) But in 1794 Pennsylvania adopted a statute defining two degrees of murder, and other states soon followed.

There appear to be two major reasons for delineating separate degrees of murder and imposing different punishments. (See Hart, Punishment and Responsibility (1968) pp. 60-61; Pike, *What is Second Degree*

---

[1]See, e.g., *People* v. *Lawhon* (1963) 220 Cal.App.2d 311 [33 Cal.Rptr. 718]; *People* v. *Butler* (1962) 205 Cal.App.2d 437 [23 Cal.Rptr. 118]; *People* v. *Misquez* (1957) 152 Cal.App.2d 471 [313 P.2d 206]. See also *State* v. *Kountz* (1972) 108 Ariz. 459 [501 P.2d 931].

*Murder in California?* (1936) 9 So.Cal.L.Rev. 112, 133.) First, some murders can more easily be prevented than others by the deterrent effect of severe penalties: e.g., a hired assassin is more likely to reflect upon the possibility of imprisonment for life than an enraged husband who shoots his wife in a drunken Saturday night quarrel. (See Zimring & Hawkins, Deterrence (1973) pp. 194 ff.) Second, society draws a *moral* distinction between murders: as morally wrong as murder per se is, some murders are more deplorable than others. Society instinctively senses a greater revulsion for a calculated, deliberate murder than it does for any other type of killing. As Professor Hart puts it, there is a distinction "universally felt between, *e.g.,* the cold-blooded murderer out for gain and the woman who kills an imbecile child to whom she can no longer attend." (Hart, *op. cit. supra* at p. 61.) Only by appropriately circumscribing the application of first degree murder can society preserve that pervasive moral distinction.

These goals are a significant aspect of the law of homicide in California. Under section 189 of the Penal Code, first degree murder is primarily wilful, deliberate, and premeditated murder. With a few limited exceptions, all other unlawful killing is second degree murder or manslaughter.

In interpreting the statutory standard of wilful, deliberate, and premeditated murder, this court, perhaps with greater consistency than courts in many states, "affords more than lip service to the strict definitions." (Note, *Deliberation and Premeditation in First Degree Murder* (1961) 21 Md.L.Rev. 349, 353.) Thus, the prosecution is required to prove not only the elements of murder, but also the aggravating elements of first degree murder. (*People* v. *Thomas* (1945) 25 Cal.2d 880, 895 [156 P.2d 7].) We have held, "By conjoining the words 'wilful, deliberate, and premeditated' in its definition and limitation of the character of killings falling within murder of the first degree, the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill." (*Id.,* at p. 900.) Further, we have declared that " 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' [Citation.]" (*People* v. *Bender* (1945) 27 Cal.2d 164, 183 [163 P.2d 8].)

In this perspective the phrasing of section 189 becomes clearer: "All murder which is perpetrated by means of . . . torture, or by *any other kind* of willful, deliberate, and premeditated killing . . . is murder of the

first degree . . . ." In labeling torture as a "kind" of premeditated killing, the Legislature requires the same proof of deliberation and premeditation for first degree torture murder that it does for other types of first degree murder.[2]

The element of calculated deliberation is required for a torture murder conviction for the same reasons that it is required for most other kinds of first degree murder. It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. (*People* v. *Tubby* (1949) *supra,* 34 Cal.2d 72, 77.) Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns. Such a crime is more susceptible to the deterrence of first degree murder sanctions and comparatively more deplorable than lesser categories of murder.

■ Accordingly, we hold that murder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain. In determining whether a murder was committed with that intent, the jury may of course consider all the circumstances surrounding the killing. Among those circumstances, in many cases, is the severity of the victim's wounds. We admonish against giving undue weight to such evidence, however, as the wounds could in fact have been inflicted in the course of a killing in the heat of passion rather than a calculated torture murder.

We do not hold that a defendant must have had a premeditated intent to *kill* in order to be convicted of murder by means of torture; such an interpretation would render superfluous the specific inclusion of murder by torture in section 189. A defendant need not have any intent to kill to be convicted of this crime (*People* v. *Mattison* (1971) *supra,* 4 Cal.3d 177, 183), but he or she must have the defined intent to inflict pain.

---

[2]We have said that "When a killing is perpetrated by means of torture, the means used is conclusive evidence of malice and premeditation, and the crime is murder of the first degree." (*People* v. *Turville* (1959) 51 Cal.2d 620, 632 [335 P.2d 678], cert. den., 360 U.S. 939 [3 L.Ed.2d 1551, 79 S.Ct. 1465].) For each case, however, the question which must first be answered is whether there was "torture" within the meaning of the statute. It is possible to inflict severe and prolonged pain on another without deliberation or premeditation, but it may not be torture under section 189. (Cf. *People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193] (sale of lethal methyl alcohol to fellow prison inmate held not to be first degree murder by poison in absence of any proof of intent to kill or injure).)

Our conclusion is consistent with the prior opinions of this court on torture murder. The cases affirming convictions for murder by means of torture have, with one possible exception,[3] involved willful, deliberate, and premeditated infliction of pain by the defendants. For example, in *People* v. *Daugherty* (1953) 40 Cal.2d 876 [256 P.2d 911], cert. den., 346 U.S. 827 [98 L.Ed. 352, 74 S.Ct. 47], defendant, prior to killing his wife, repeatedly threatened to make her *suffer* for her alleged infidelity. "He tore her nightgown from her, stabbed her several times and, from the dirt-filled abrasions on her thigh, must have dragged her along the ground. He evidently struck her in the face. And finally, when she was lying on the ground but still alive, he stood over her and kicked her." (*Id.,* at pp. 886-887.) The evidence of defendant's planning and deliberation was held sufficient to convict him both of wilful, deliberate, and premeditated murder and murder by means of torture.

*People* v. *Turville* (1959) *supra,* 51 Cal.2d 620, represents perhaps the paradigm torture case. There the defendants repeatedly hit and kicked their victim in an effort to persuade him to open his safe. The pain was clearly inflicted in a calculated manner, and this court upheld a torture murder conviction.

In contrast, the cases reversing torture murder convictions have focused on the lack of evidence of calculation. In *People* v. *Bender* (1945) *supra,* 27 Cal.2d 164, defendant, in a fit of anger, beat and choked his victim to death. We held, "The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the severe pain which may be assumed to attend strangulation, has not in contemplation of the law the same intent as one who strangles with the intention that his victim shall suffer." (*Id.,* at p. 177.)

In *Tubby,* the defendant for no discernible reason beat his stepfather to death. According to the dissent, "The evidence clearly indicates that defendant chased his victim about the house inflicting terrific punishment upon him. There was blood on the porch, and on the walls and floor of practically every room in the house. The stove and stovepipe had

---

[3]In *People* v. *Gilliam* (1952) 39 Cal.2d 235 [246 P.2d 31], defendant, for no reason at all, beat and trampled to death a fellow prison inmate he had just met. It is arguable whether he had a calculated intent to inflict extreme pain on his victim or whether his attack was the type of explosion of violence born of "hot anger" and "animal fury" which the court in *People* v. *Tubby* classified as second degree murder. (34 Cal.2d at pp. 77-78.) The majority, upholding a torture murder conviction, emphasized that defendant gouged out his victim's eye and that the sadistic episode consumed considerable time. Justice Carter dissented on the basis of *Tubby.*

been knocked out of place and some of the furniture had been broken during the affray. When the officers arrived, they found deceased had been beaten 'practically beyond recognition.' " (34 Cal.2d at p. 81.) Even so, the majority concluded that "It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer. . . . The evidence is therefore insufficient as a matter of law to support the verdict on the theory that the homicide was murder by torture." (*Id.,* at p. 78.)

An even more gruesome murder was reviewed by this court in *People v. Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43], with similar results. In *Anderson,* defendant, angered at the 10-year-old daughter of his mistress, stabbed the child a total of 60 times. "One of the cuts extended from the rectum through the vagina. Additionally, the tongue was cut." (*Id.,* at p. 356.) Again, we held that "the evidence in the instant case shows only an explosion of violence without the necessary intent that the victim shall suffer. . . . Accordingly, the evidence was not sufficient to convict defendant of murder in the first degree on the theory that death resulted from acts of torture." (*Id.,* at p. 360.)

It is clear from the foregoing analysis that on the record of the case at bar defendant cannot be guilty of first degree murder by torture. Viewed in the light most favorable to the People, the evidence shows that defendant severely beat her stepchild. But there is not one shred of evidence to support a finding that she did so with cold-blooded intent to inflict extreme and prolonged pain. Rather, the evidence introduced by the People paints defendant as a tormented woman, continually frustrated by her inability to control her stepchild's behavior. The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated.

The People emphasize that the child's wounds were inflicted over a long period of time. In some cases this fact might lend support to a torture murder conviction. For example, if a defendant had trussed up his victim, proof that pain was inflicted continuously for a lengthy period could well lead to a conclusion that the victim was tortured. But in the present case the fact that Kristen was injured on numerous occasions only supports the theory that several distinct "explosions of violence"

took place, as an attempt to discipline a child by corporal punishment generally involves beating her whenever she is deemed to misbehave.[4]

Child-battering is a crime universally abhorred by civilized societies, particularly when it results in death. Yet our revulsion is based not so much on the means of killing, as on the realization that a defenseless, innocent life has been destroyed. If defendant, instead of repeatedly beating her stepchild, had fatally shot her once in the head, it could not be claimed seriously that the shooting would be any less subject to deterrence or any less morally offensive than the beating in the present case. Yet the shooting could not be categorized as murder by means of torture. Nor can defendant's conduct here, however deplorable it appears to be.

In holding the evidence does not support a conviction of first degree murder, we do not imply, of course, that a murder of a child can never be torture murder. In appropriate circumstances a child batterer can be found to be a torturer. All we hold is that here the prosecution did not prove defendant murdered her stepchild with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain. It follows that the trial court erred in giving an instruction on torture murder.[5] As stated in *People* v. *Anderson* (1965) *supra,* 63 Cal.2d 351, 360, " 'It is error to give an instruction which, although correctly stating a principle of law, has no application to the facts of the case.' "

■ Defendant next objects to the admission of two lengthy incriminating statements to the police while she was in custody. The first statement was made to a police sergeant a few hours after the death of Kristen. Later that day defendant approached a jailer, spontaneously admitted culpability, and asked to make a "confession."

---

[4]This theory is consistent with the literature on the battered child syndrome, which has been judicially recognized in this state. (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 506-508 [95 Cal.Rptr. 919].) While obviously it is impossible to typify all child-battering parents, one survey of the studies in the field concludes: "the abuser tends to suffer from emotional pressures which are not directly related to the child himself, focuses his own general feelings of frustration and anger on the one child, and expresses his emotions through an immature and *uncontrolled* display of physical abuse of the child." (Italics added.) (Note, *The Battered Child: Logic in Search of Law* (1971) 8 San Diego L.Rev. 364, 375.) The description seems applicable to the present defendant: her *uncontrolled* outbursts of frustration appear inconsistent with a theory of deliberate torture murder.

[5]The court also gave general first degree murder instructions on wilful, deliberate and premeditated killing. However there was no evidence of premeditation other than that related to torture. It was conceded on appeal that the prosecution tried the case entirely on a murder by torture theory.

Defendant contends the first statement is inadmissible because she made it without voluntarily waiving her constitutional rights as required by *Miranda* v. `Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and because the statement was involuntary under the circumstances. The second statement, she claims, is invalid as a direct product of the first.

The *Miranda* argument is without merit. A transcript of the tape-recorded conversation between defendant and the police sergeant reveals she was advised of each of her *Miranda* rights before making the statement. Defendant claims her waiver was "equivocal." When asked if she wished to give up her right to remain silent, she answered, "If I can"; asked if she waived her right to have an attorney present during questioning, she nodded her head. However, on each occasion the sergeant then asked her if she meant "yes," and each time she replied, "yes." Her contention now that she did not understand what she was doing is belied by the record.

■ Defendant's involuntariness contention is based on the claim that she spoke to police only to free her husband Ralph.[6] A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid. (See, e.g., *People* v. *Trout* (1960) 54 Cal.2d 576, 584-585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Rand* (1962) 202 Cal.App.2d 668, 674 [21 Cal.Rptr. 89].) However, where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate an admission. (*People* v. *Montano* (1960) 184 Cal.App.2d 199, 210 [7 Cal.Rptr. 307]; *People* v. *Abbott* (1958) 156 Cal.App.2d 601, 605 [319 P.2d 664]; Annot., Voluntariness of Confession (1961) 80 A.L.R.2d 1428, 1438.) In one case, even though police had made vague promises to see "what could be done" about freeing a suspect's friends, a subsequent confession was held admissible because the subject of leniency for the friends was introduced initially by the suspect, not the police. (*People* v. *Kendrick* (1961) 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13].)

In the present case, the police made no threat or promise, either express or implied, regarding the fate of defendant's husband. Any desire of defendant to aid her husband by confessing was entirely self-motivated. It must be concluded that her statements were voluntary.

---

[6]Ralph Steger, a codefendant in this case, was convicted of the lesser charge of child abuse. (Pen. Code, § 273a.)

■ Defendant next maintains that the court improperly admitted a statement to police by her codefendant husband. A tape recording of the statement was played to the jury in conjunction with Ralph's in-court testimony.

Defendant's contention is based on *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], which held that when the defendant in a joint criminal trial is implicated by an out-of-court statement by a codefendant, the admission of the statement violates the defendant's right to cross-examination under the confrontation clause of the Sixth Amendment. However, in *Nelson* v. *O'Neil* (1971) 402 U.S. 622, 629-630 [29 L.Ed.2d 222, 228-229, 91 S.Ct. 1723], the Supreme Court ruled that when the codefendant takes the stand, denies making the out-of-court statement and testifies favorably to. the defendant, the latter's rights have not been impaired. And this court has declared that "The same rule applies when the codefendant testifies and affirms his out-of-court statement." (*In re Rosoto* (1974) 10 Cal.3d 939, 952 [112 Cal.Rptr. 641, 519 P.2d 1065], cert. den., 419 U.S. 897 [42 L.Ed.2d 141, 95 S.Ct. 177].)

In the case at bar Ralph testified favorably to defendant, was subject to cross-examination, and did not deny making the tape-recorded statement to the police. Moreover, his recorded conversation with the police was not damaging to defendant: in that conversation Ralph denied ever seeing his wife severely beat Kristen, and corroborated defendant's theory that the child was accident-prone and bruised easily. The court committed no error in admitting the out-of-court statement.

Defendant next contends her conviction should be reversed because her counsel was incompetent. Specifically, counsel failed to object to admission of certain evidence—including a bloodstained pillow—and failed to move for a mistrial when it was revealed that three jurors had been improperly discussing the case during the trial.

■ In order to obtain a reversal on the grounds of the incompetence of counsel an "'extreme case must be disclosed.'" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) It must appear that counsel's inadequacy reduced the trial to a "farce" or a "sham," or that "he did not effectively supply to a defendant those skills and legal knowledge which we can reasonably expect from any member of the bar." (*People* v. *Cook* (1975) 13 Cal.3d 663, 672-673 [119 Cal.Rptr. 500, 532 P.2d 148].) Generally, a single lapse of skill will not be held to

have resulted in denial of a fair trial. (*People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961], cert. dism., 406 U.S. 912 [32 L.Ed.2d 112, 92 S.Ct. 1619].)

In *Ibarra,* we reversed a conviction for possession of heroin when the record revealed that defense counsel failed to object to an illegal seizure of the contraband. Counsel did not appear to know the basic California rule that the defendant could challenge the legality of the search and seizure even though he had denied possession of the heroin. In *Terry,* however, we stated that even when a search is unlawful and counsel fails to object, counsel's mistake, if isolated, will not warrant reversal unless it deprived the accused of a basic defense. (2 Cal.3d at p. 393.)

■ The present case is closer to *Terry* than to *Ibarra.* As in *Terry,* there is no evidence that the items in question were seized through an unlawful search. Further, in contrast to *Ibarra* there is no showing that counsel failed to appreciate a recognized legal principle. In fact, he objected strenuously to the far more damaging introduction of defendant's admissions and the autopsy photographs. Failure to object to admission of the items seized may have been based on a correct determination that they were seized lawfully or may have been a strategic judgment that the items were not particularly damaging. Indeed, the blood on some of the items showed at most that Kristen was severely injured, a fact that should have been obvious to all from the autopsy photographs and eyewitness testimony of medical personnel.

■ Failure to move for a mistrial following revelation of jurors' premature discussion of the case may also have reflected a strategic judgment. Counsel did inform the court of the jurors' conversation. The record reveals that counsel was aware he could move for mistrial or ask to have any offending juror removed. Instead, he simply asked the judge to admonish the jury again on its duty not to discuss the case before submission. This decision by counsel may have reflected a belief that the trial was proceeding satisfactorily or that he would be unlikely to obtain a more sympathetic jury in a future trial. In either event we will not second-guess counsel on this matter. (*People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513].) The conclusion is inescapable that defendant was convicted because of strong evidence, not weak counsel.

■ Defendant objects to the showing of autopsy photographs throughout the trial, contending they prejudiced her case by inflaming the jury against her. ■ The test for determining whether photo-

graphs may be shown to the jury is not whether they are necessary, but whether their probative value outweighs their possible prejudicial effect. (*People* v. *Harrison* (1963) 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665].) In the case at bar, the principal theory of the defense was that Kristen was not beaten to death, but rather fell or was hit by a swing. The autopsy photographs were used to show the extent of the injuries and when they were inflicted, in order to establish the unlikelihood of accidental causation. Two expert witnesses testified the photographs would aid their explanation of the injuries. We uphold the sound exercise of discretion by the trial court in admitting the photographs.

 Finally, defendant claims the testimony of codefendant Ralph Steger concerning Kristen's state of mind was hearsay and should not have been admitted. It is not necessary to explore the "state of mind" hearsay exception or speculate on the effectiveness of the court's limiting instruction to the jury that Ralph's statements were not relevant to the guilt of his wife. As with defendant's *Bruton* objection, she is unable to point to any statement by the codefendant that remotely incriminates her. Thus defendant has shown no prejudicial error.

In short, defendant's only meritorious claim is that there was insufficient evidence to justify a first degree conviction of murder by means of torture. But a new trial is not justified. There is overwhelming evidence that defendant is guilty of second degree murder. (See, e.g., *People* v. *Bassett* (1968) 69 Cal.2d 122, 148 [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Tubby* (1949) *supra,* 34 Cal.2d 72, 79-80.)

The judgment is therefore modified by reducing the degree of the crime to murder of the second degree, and as so modified is affirmed. (Pen. Code, § 1260.) The cause is remanded to the trial court for probation and sentence hearing in light of the crime of which she now stands convicted (see *People* v. *Ruiz* (1975) 14 Cal.3d 163 [120 Cal.Rptr. 872, 534 P.2d 712]), and for resentencing in accordance with the determination there made.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**CLARK, J.**—I dissent on the ground that a finding of willful, deliberate and premeditated intent to inflict extreme and prolonged pain is supported by this record.

The requisite intent for murder by torture may be inferred from the condition of the victim's body. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1083 [80 Cal.Rptr. 567, 458 P.2d 479]; see *People* v. *Turville* (1959) 51 Cal.2d 620, 632 [335 P.2d 678], overruled on other grounds, *People* v. *Morse* (1964) 60 Cal.2d 631, 637, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) The condition of the victim's body here not only supports such an inference, it virtually compels it.

Because the most severe injuries can be approximately dated, we know that defendant savagely beat her three-year-old stepdaughter for a month before death finally released the child from her suffering. A month before she died Kristen's left cheek bone was fractured. A week later her right forearm was fractured. Two days before she died Kristen's chin was cut to the bone; sutures would have been required to close the wound but it was left untended as were all her other injuries. A day later Kristen was struck in the abdomen with such incredible violence that her liver, adrenal gland, intestines and diaphragm hemorrhaged. Finally, the day of her death, Kristen's skull was fractured, causing the entire left half of her brain to hemorrhage. Defendant apparently shoved the child's head into the toilet and broke the lid over it. Kristen was then left to die, the ambulance not being called until rigor mortis began to set in. When the emergency room nurse saw Kristen's pathetic corpse, "there wasn't two inches of her body that didn't have black-and-blue marks."

The majority conclude "the fact that Kristen was injured on numerous occasions only supports the theory that several distinct 'explosions of violence' took place." (*Ante,* pp. 548-549.) To the contrary, this court's decisions do not support the conclusion that injuries of the sort inflicted on this child must be attributed to "explosions of violence," rather than intent to torture.

The majority rely on *People* v. *Bender* (1945) 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Tubby* (1949) 34 Cal.2d 72 [207 P.2d 51]; and *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43]. (*Ante,* pp. 547-548.) In each of these cases the inference of intent to torture arising from the condition of the victim's body was overcome by evidence that the defendant had been too intoxicated to form such intent. There is no such evidence in this case.

In *Bender,* the defendant beat and strangled his wife. Reviewing the evidence, including the defendant's testimony that he and his wife drank two to four quarts of liquor daily, this court stated: "[I]f the testimony,

letters, and declarations of defendant are considered as a whole they show that the marriage of defendant and deceased began inauspiciously when defendant failed to tell deceased that his previous marriage had not been dissolved, and that some eight months later the violent disagreements which characterized the marriage culminated, after several hours of drunken quarreling, in murder. . . . This picture suggests reasons for and the facts of quarreling between decedent and defendant but leaves only to conjecture and surmise the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation. Overwhelmingly opposed to such conjecture or surmise, and consistently evidenced by every circumstance, is the rationale of a tempestuous quarrel, hot anger, and a violent killing." (27 Cal.2d at pp. 179-180.)

In *Tubby,* the defendant beat his stepfather to death. "[T]he record [was] devoid of any explanation of why the defendant might have desired his stepfather to suffer. The only testimony concerning the relationship between the two men was that the deceased and the defendant were on amicable terms prior to the attack." (34 Cal.2d at p. 77.) What the record did show was that the defendant had a record of murderous violence when intoxicated, that he had consumed a half-gallon of sherry hours before the attack, and that he was then in "a 'fighting mood,' inclined to fight almost anyone and not primarily interested in causing the ultimate victim to suffer." (*Id.,* at pp. 77-78.) Accordingly, this court held: "It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer. When death results under the circumstances here shown the homicide cannot be said to constitute murder by torture." (*Id.,* at p. 78.)

In *Anderson,* the defendant killed a child, horribly mutilating her body with a knife. His primary defense was that the killing had occurred during an epileptic seizure; two psychiatrists so testified. There was also evidence that the defendant had an "explosive temper." Finally, the defendant testified and the People admitted that he had consumed a substantial amount of alcohol that day. Three hours after the killing the defendant had .34 per cent of alcohol in his bloodstream. A prosecution expert testified that "all individuals, regardless of susceptibility or tolerance, show some signs of impairment at .24 per cent alcohol in the bloodstream. From below .30 per cent to between .40 and .50 unconsciousness results." (63 Cal.2d at p. 358.) It was under these circumstances

that this court held that "the evidence in the instant case shows only an explosion of violence without the necessary intent that the victim should suffer." (*Id.,* at p. 360.)

In this case, by contrast, there is no evidence that intoxication or any other condition rendered defendant incapable of intending the suffering which was the inevitable result of her brutality. To the contrary, having a week to reflect on the consequences of her behavior after fracturing the child's cheek bone, defendant tortured Kristen repeatedly for another three weeks before finally beating the child to death.

I agree with the majority that the distinction between first and second degree murder is based in part on the fact that "society draws a *moral* distinction between murders: as morally wrong as murder per se is, some murders are more deplorable than others." (*Ante,* p. 545.) However, unlike the majority, I cannot conceive that society finds anything more deplorable than intentionally causing an innocent child the suffering of the damned. Therefore, I would affirm the judgment.

McComb, J., and Richardson, J., concurred.