Filed 8/17/16  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076157 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F07874) |
| v. | |
| TYWAN LEONARD JOHNSON, | |
| Defendant and Appellant. | |

In November 2012 Jeffery Rozenski was found stabbed to death in a parking lot. An information charged defendant Tywan Leonard Johnson with murder and torture. (Pen. Code, §§ 187, subd. (a), 206.)[1]  A jury found defendant guilty of the lesser included offense of second degree murder and torture.  The court sentenced defendant to 15 years to life in prison on the murder count, plus a consecutive term of one year for personally using a weapon, and life on the torture count, plus a consecutive term of one year for personally using a weapon, stayed pursuant to section 654.  Defendant appeals,

---

[1]  All further statutory references are to the Penal Code.

1

contending prosecutorial misconduct, instructional error, cumulative error, insufficiency of the evidence, and that the court erred in denying his *Batson*/*Wheeler* motion.[2]  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Cedric Mason, a friend of defendant, was also a friend of Jeff Rozenski, the victim.  The trio and Mason's girlfriend got together on November 26, 2012.  Rozenski and defendant became embroiled in a dispute over money defendant had given Rozenski to purchase drugs.  Mason fled, leaving Rozenski and defendant alone.  Mason and his mother then drove around trying to find the victim before seeing his bicycle at the scene of the murder.  They flagged down some passing firefighters, who saw Rozenski's body and themselves flagged down a police officer and advised him they had located a homicide victim.

An information charged defendant with murder and torture.  In association with each count, the information alleged defendant personally used a deadly weapon, a knife, in the commission of the offense.  (§ 12022, subd. (b)(1).)  Defendant entered pleas of not guilty to each charge.

A jury trial followed.  The evidence revealed the following events.

**Cedric Mason's Testimony[3]**

Mason and his girlfriend ran into defendant at a light rail station on the day of the murder.  The trio decided to get "high" on methamphetamine and took a train to another light rail station.  At the second station they ran into Rozenski.  Defendant and Rozenski had never met before.

---

[2]  *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[3] Some of Mason's testimony is taken from a police interview that was played for the jury.

Mason told Rozenski about their plans to get high. Rozenski joined the group, and they all walked to Mason's mother's house. Everyone was getting along. Mason and his girlfriend went into the house. When they came back outside, defendant and Rozenski were "doing lines" of methamphetamine off the top of a garbage can. After Mason told them to stop, defendant and Rozenski walked off together. Defendant gave Rozenski money for more methamphetamine.

Defendant and Rozenski returned to the residence a couple of hours later. Mason observed that Rozenski was keeping his distance from defendant. As the three men and Mason's girlfriend left the residence, Mason could tell there was tension between defendant and Rozenski.

As they walked, defendant told Mason that Rozenski still had the money defendant had given him earlier in the evening to buy drugs with and was refusing to return it. Defendant asked Mason if he could get the money back. Mason asked Rozenski, who was riding a bike ahead of the group, to give defendant his money back.

Initially, Rozenski ignored Mason's request but then stopped and said "here" and showed Mason he had the drugs. Mason's girlfriend left. Defendant, Rozenski, and Mason walked to a veterinary clinic parking lot and began smoking the crystal methamphetamine Rozenski provided. However, the crystal methamphetamine turned out to be "fake."

Defendant and Rozenski began arguing and defendant wanted his money back. Rozenski refused. Mason said he would get the money from his mother, but defendant insisted that Rozenski pay him. Defendant grabbed Rozenski, who said, "[W]hy are you doing this to me?" and "I did you right." Mason told defendant to leave Rozenski alone, but defendant refused. Frightened, Mason ran home, and as he ran he heard Rozenski screaming and saying he could not breathe.

When he got to his house, Mason told his mother that Rozenski was getting "jumped." Mason and his mother got in a car and went in search of Rozenski. When

3

they drove past the area where Mason had last seen Rozenski, they saw his bike reflector. Mason's mother flagged down a passing fire truck and told them somebody might be hurt.

**Subsequent Investigation**

Sacramento County Sheriff's Deputy Jeremy Day was flagged down near the scene and found Rozenski lying on his back on top of a bicycle. Day saw blood on Rozenski's face and a large open laceration across his neck.

Detective Stanley Swisher processed the crime scene. He observed Rozenski's face and neck were covered in blood and there were cuts to his hand. On the wall behind Rozenski's head there was a large pattern of splattered blood. Swisher also found a hypodermic needle, a cellophane wrapper from a cigarette package, a broken cigarette lighter, and a baggie that had been tied off and then ripped open and appeared to contain white powder residue.

**Defendant's Interview**

Detectives Tom McCue and Jeffrey Wallace interviewed defendant the day after the victim's death. A videotape of the interview was played for the jury. McCue observed cuts on defendant's fingers, some of which appeared to be recent. Defendant had "dreads." Neither McCue nor Wallace observed any bruises, cuts, or other marks on defendant's face to indicate he had been in a fight. Nor did the detectives observe anything to lead them to believe defendant was under the influence of alcohol.

Wallace asked defendant if he had heard about the events of the previous evening. Defendant responded: "I'm gonna just tell you what happened. I was drunk and I ran into some dude. He was tripping on me so we were scuffling and then we're fighting and then it just escalated." Defendant said he began to drink that day at 3:00 o'clock in the afternoon and ended up drinking a fifth of vodka and a tall can of beer.

Defendant said he heard on the news that the other man had died. He had never met the man before that evening, and the man appeared to be on "some crystal or

4

something." As he walked by the veterinary clinic, defendant exchanged words with the man, who walked close to him. Defendant struck the man and a fight began. Defendant stabbed the man with a pocketknife.

Defendant told detectives he had been in the area of the veterinary clinic with a man he knew as "Bo" with whom he had previously worked.[4] He and Bo ran into each other at the light rail station, and they decided to walk to a store to buy cigarettes. As they walked, a "white guy" on a bike bumped into defendant. Defendant said something to the man and the man got off of his bike and walked up to him. After defendant punched the man, the two began to fight. As they fought, defendant began stumbling because he was drunk.

The pair fell to the ground and the man began to pull defendant's hair. Defendant told the man to let him go and then remembered he had a knife in his pocket. Defendant got out the knife and warned the man he would stab him if he did not let go. The man kept pulling defendant's hair and punching him. Defendant began to stab him. Defendant kept stabbing the man, at one point dropping and then recovering the knife, until defendant pushed the man off and the man finally let go of defendant's hair. Defendant stabbed the man five or six times.

After the fight, defendant and Bo walked and then separated. Defendant went across the street to the light rail station and took a train. He got off the train and threw the knife down a storm drain. Defendant then took a train home.

Several family members were there when he got home. He was "really shaky" and "scared." He told his family he "got into it with somebody and I think I killed somebody." Defendant "really got all shaky" when he watched the news and discovered

---

[4] Mason is also known as "Bo."

the man had died.  Defendant "just couldn't believe" what he had done because he had been drunk when it happened.

Detective McCue asked defendant if he had gone to Bo's house "just before this." Defendant said he had gone to Bo's house, where Bo had gone inside to see his girlfriend. Bo finally came out and left with defendant.  Defendant admitted that the "white guy" had been with them when they left the house.  He did not know the man but thought he was Bo's friend.

Defendant subsequently stated the man had stolen $13 from him, taking advantage of him because he was drunk.  The three men smoked "crystal" together.  Defendant then stated he had given the man $13 to buy crystal methamphetamine, but the man returned with only a small quantity of the drug.  They all smoked two "bowls" together, using a glass pipe provided by defendant.  After they smoked the drug, the three men walked toward the light rail station.  Bo said the man should return defendant's money, but the man refused.

As they approached the veterinary clinic, the man walked up to defendant.  After the man grabbed defendant's hair and punched him, defendant stabbed the man. Defendant acknowledged that he had been "a little bit" angry when he stabbed the man. Detective Wallace asked if defendant had been unable to stop once he began stabbing the man, and defendant replied, "I just wanted him to let me go."

**Rozenski's Autopsy**

A forensic pathologist performed the autopsy on Rozenski.  The pathologist determined that Rozenski died from a combination of sharp and blunt injuries to the head and neck.

Rozenski suffered from 57 sharp injuries to his head and neck.  He also suffered 21 injuries to his hands, two sharp injuries to the back of his left forearm, and two sharp injuries to the back of his left wrist.  The pathologist determined most of the sharp injuries were "incisions, meaning they go across the body for a greater distance than they

6

go deep into the body." Some of the sharp injuries combined an incision injury with a stab injury; the latter "goes deeper into the body for a greater distance than it goes across the body." Five of the injuries to Rozenski's head and neck were stab injuries.

Rozenski suffered blunt trauma to his head and "had multiple bruises and scrapes to his head to both sides of the head, to the right eyebrow region, to the cheek bones, to the tip of the nose. As well he did have some scrapes and bruises of his upper chest[,] his left abdomen and his left leg."

The prosecution presented photographs of Rozenski's injuries to the pathologist, who described the injuries in greater detail. The injuries included an injury on the right and middle of the neck that went so deep that it cut the cartilage of the larynx. In addition, three stab wounds to the left of the neck were more severe and went "deep into a region of the . . . left front part of the neck where there are multiple blood vessels passing through, and it causes disruption or cutting a part of the tissue there with damage to the jugular vein and to branches of the artery called the external [carotid] artery."

**Defense**

A criminalist testified she tested a sample of Rozenski's blood. The blood contained 0.03 milligram per liter of amphetamine and 0.29 milligram per liter of methamphetamine.

Another criminalist testified she tested a blood sample drawn from defendant the afternoon after the murder. The criminalist confirmed the presence of "Delta 9 THC," which is the parent drug for marijuana. However, she could not say when defendant had ingested the marijuana. Defendant's blood sample screened negative for the presence of methamphetamine and amphetamine. Methamphetamine has an average half life of about 10 hours, and amphetamine has an average half life of about 12 hours. Therefore, a negative result for methamphetamine and amphetamine is not determinative of whether a person ingested methamphetamine in the 24-hour period prior to the blood draw.

7

Alan Estep testified he had been best friends with defendant for about 13 years.[5] Estep was at defendant's mother's house when defendant arrived the afternoon prior to the murder. Defendant appeared intoxicated, slurring his speech and carrying a bottle of alcohol. Defendant and Estep finished the rest of a half-full bottle of whiskey. Then the pair drank four or five shots of vodka. Defendant left around 4:30 that afternoon, staggering and speaking incoherently. Estep believed defendant was drunk.

Mason testified he did not see defendant consume alcohol the day of the murder, although defendant did have a bottle of alcohol when they first met up at the light rail station. Defendant offered Mason and his girlfriend a drink, which they declined. That afternoon and evening defendant appeared to be sober and Mason had no difficulty understanding him.

**Verdict and Sentencing**

The jury found defendant not guilty of first degree murder but guilty of the lesser included offense of second degree murder and guilty of torture. In addition, the jury found the weapon use allegation associated with each count to be true. The court sentenced defendant on the murder count to 15 years to life in prison, plus one year for the weapon use enhancement, for a total term of 16 years. The court sentenced defendant to life in prison for the torture count, plus one year for the weapon use enhancement, stayed pursuant to section 654. Defendant filed a timely notice of appeal.

DISCUSSION

**Prosecutorial Misconduct**

Defendant argues the prosecution misstated the law on heat of passion during closing argument. Therefore, his convictions for murder and torture must be reversed.

---

[5] Estep had a prior conviction for misdemeanor false imprisonment in 2010, a conviction for misdemeanor second degree burglary in 2013, and two convictions for misdemeanor petty theft in 2013.

8

*Background*

The trial court instructed the jury pursuant to CALCRIM No. 522: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The court also instructed on heat of passion: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"And

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote

9

provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

The court also instructed on torture pursuant to CALCRIM No. 810:  "The defendant is charged in Count Two with Torture in violation of Penal Code section 206.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant inflicted great bodily injury on someone else;

"And

"2.  When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, persuasion, or for any sadistic purpose.

"*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

"Someone acts with a *sadistic purpose* if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself."

During closing argument, defense counsel argued defendant was guilty of manslaughter, not murder, because he acted in the heat of passion.  As for the torture

charge, defense counsel contended the evidence did not support a finding that defendant intended to cause cruel or extreme pain, but "[t]his was done in the heat of passion.

"It was not done to torture anyone."

The prosecutor argued heat of passion did not apply: "Heat of passion, I call it two subjective, one objective. Number one is subjective. The defendant was provoked . . . . [¶] . . . [¶]

"Say the victim by his actions is not giving him money back, $13. Say that's provocation. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion. Subjective. Let's say that's true. Let's say somebody took your money, your $13 and made you smoke some bad dope. [¶] . . . [¶]

"Now, the third part is the objective part. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment.

"Okay. You look at the act and see if the act and the passion, if they meet. First of all, it is the person of average disposition. Not an average drunk person, not an average person on drugs. Your average person. Average person."

Defense counsel objected, arguing the prosecutor was misstating the language in the instruction. The court overruled the objection.

The prosecutor continued: "An average person of average disposition. I call it the ah-ha section because the average person says you ah-ha. I can see. I get it. The average person of average disposition can say okay I get it. I see how somebody could react rashly and this is what they did. You can say I get it.

"The reason why heat [of] passion is because it comes from way back when somebody finds their spouse in bed with another, and they do something rashly like shoot a person.

"Somebody says okay. I get it. You come home, and you see your child being molested . . . ."

11

Defense counsel objected on grounds of improper argument in the example of molestation as provocation. The court responded that the prosecutor was trying to explain the instruction by giving examples and overruled the objection.

The prosecutor further argued: "And you see and you react in a certain way and you shoot a person. You can say you Ah-ha. I get it. I see how the person could have acted rashly and did this.

"So the question you have to ask in this case is having your money, your $13 taken from you and smoking bad dope the average person, average disposition would take out a knife and slice somebody up."

Defense counsel objected: "No pinpoint." The trial court overruled the objection.

The prosecutor continued: "You can't take out a knife. The average person of average disposition is not going to take out a knife and slice somebody up. They are not over $13. No. The average person may act rashly. Maybe, maybe punch somebody, maybe, maybe. And that's stretching it.

"But the average person of average disposition who loses $13 does not act rashly and slice, slice, slice, slice."

Defense counsel objected: "Same objection, continuing." The trial court again overruled the objection.

The prosecutor concluded: "They don't. That's why it is not heat of passion voluntary manslaughter because the average person of average disposition wouldn't act rashly over $13 and do that.

"It tells you in deciding whether provocation was sufficient consider whether a person of average disposition in the same situation and knowing the same facts would have reacted [with] passion rather than judgment.

"It has got to be -- that passion has to be where it just jacks up your judgment. It has got to be something extreme where you say yeah. I get it. I can see how my

judgment is jacked up because what this person does is that egregious. That's what this is saying."

### *Discussion*

Defendant urges reversal of his convictions for second degree murder and torture due to the prosecutor's misconduct in misstating the heat of passion standard. He argues the court erred in overruling his final two objections to the prosecutor's argument on heat of passion, violating his right to due process. The prosecutor, defendant contends, told the jury that for provocation to be sufficient for heat of passion to apply, it would have to provoke a reasonable person in defendant's position to stab Rozenski repeatedly in the face and neck, a misstatement of the law.

Sudden quarrel or heat of passion occurs when the defendant kills because of a legally sufficient provocation. A provocation is legally sufficient if it would cause a reasonable person of average disposition to act rashly. We focus on the provocation, the surrounding circumstances, and whether they were sufficient to cause a reasonable person to act rashly. How the specific defendant responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion. (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*); *People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*).)

Therefore, if the prosecution argues that the jury focus on the reasonableness of the defendant's specific response to the provocation, it amounts to misconduct. (*Najera*, *supra*, 138 Cal.App.4th at p. 223.) Such misconduct may be intentional or inadvertent; a misstatement of the standard amounts to misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823 & fn. 1.)

Two decisions provide some assistance in analyzing alleged prosecutorial misconduct in describing provocation in the context of heat of passion. In *Najera*, the defendant stabbed a man to death after the man called him a faggot. During closing argument, the prosecution stated heat of passion was inapplicable because a reasonable

13

person in the defendant's position would not have pulled out a knife and stabbed the victim in response to the slur. The appellate court found the prosecution had misstated the standard and the comment amounted to misconduct. (*Najera*, *supra*, 138 Cal.App.4th at pp. 216, 223-224.) In *Beltran*, the defendant stabbed his girlfriend to death after she told him she had aborted their unborn child. The trial court instructed the jury that the standard for heat of passion is whether a reasonable person would have been provoked to the point of acting rashly. (*Beltran*, *supra*, 56 Cal.4th at pp. 941, 943-944.) However, the prosecution argued that even if the jury believed the defendant, heat of passion did not apply because a reasonable person who learns of an ex-girlfriend's abortion would not be provoked to the point of murder. (*Id*. at p. 943 & fn. 5.) This misstated the standard, according to the Supreme Court: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 949.) The Supreme Court found the prosecution's argument misstated the standard and constituted misconduct. Although the trial court provided an accurate instruction on heat of passion, the prosecution's argument "may have confused the jury's understanding of the court's instructions." (*Id*. at p. 955.)

In the present case, the prosecutor repeatedly argued the "average person of average disposition who loses $13 does not act rashly and slice, slice, slice, slice." However, as set forth in *Beltran*, provocation is not measured by whether the average person would act in a certain way; the question is whether the average person would react in a certain way, with reason and judgment obscured. (*Beltran*, *supra*, 56 Cal.4th at p. 949.) The prosecutor misstated the law during argument.

We must consider the consequences of the prosecutor's statements. Defendant argues we analyze any prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24

14

[17 L.Ed.2d 705] (*Chapman*) and consider whether the error is harmless beyond a reasonable doubt. The People contend we employ the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*) and determine whether there is a reasonable probability that but for the error the jury would have returned a verdict of voluntary manslaughter rather than second degree murder. We find the error harmless under either standard.

At trial, defendant argued he was guilty of manslaughter, not murder, because he acted in the heat of passion when Rozenski cheated him out of the money defendant had given him to buy drugs. However, the mere fact Rozenski failed to return defendant's $13 would not provide the jury with evidence an average person would experience a sudden heat of passion causing him to act rashly and without deliberation.

On appeal, defendant asserts two additional examples of Rozenski's provocation that could have convinced the jury to find him guilty of manslaughter.

First, defendant states that following his arrest he told officers he "stabbed Rozenski because Rozenski would not stop pulling his dreadlocks and hitting him in the head after the two began quarreling." However, during the interview defendant stated he struck Rozenski first after demanding repayment of the $13. "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion." *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

Second, defendant states that in his interview with officers, Mason stated that Rozenski asked Mason, "[D]o you know this nigga - do you know this nigga - do you know this nigga," referring to defendant. However, none of the evidence presented at trial reveals that defendant ever heard Rozenski's statements, much less reacted to them. Despite the prosecutor's misstatement of the law of heat of passion, we find no error under either *Watson* or *Chapman*.

15

**Instructional Error—Imperfect Self-Defense**

Defendant faults the trial court's instructions on imperfect self-defense, contending the court improperly modified CALCRIM No. 3471 and No. 3472. According to defendant, these instructions apply only to self-defense, not imperfect self-defense.

### *Background*

The trial court instructed pursuant to CALCRIM No. 505: "The defendant is not guilty of murder if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if:

"1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

"And

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

16

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of great bodily injury has passed. That is so even if safety could have been achieved by retreating.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

In addition, the court instructed pursuant to CALCRIM No. 571: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

"If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if:

"1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

"And

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger.

"But

"3. At least one of those beliefs was reasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

17

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

At issue in the present case are the following instructions. The court instructed pursuant to CALCRIM No. 3471: "A person who engages in mutual combat or who starts a fight has a right to self-defense *or imperfect self-defense* only if:

"1. He actually and in good faith tried to stop fighting;

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

"And

"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense *or imperfect self-defense* if the opponent continued to fight.

"A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense or *imperfect self-defense* arose." (Italics added for all phrases except "mutual combat.")

The court also instructed pursuant to CALCRIM No. 3472: "A person does not have the right to self-defense *or imperfect self-defense* if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (Italics added.)

After the court instructed the jury, but prior to closing arguments, the court noted the prosecution had requested the phrase "imperfect self-defense" to be inserted where

18

"self-defense" is mentioned in CALCRIM No. 3471, No. 3472, and No. 3474, and that defense counsel had objected to the modification to CALCRIM No. 3474 since it "would make that instruction at odds with the imperfect self-defense instruction." The court modified CALCRIM No. 3471 and No. 3472 but not No. 3474.

### *Discussion*

Defendant contends the trial court improperly modified CALCRIM No. 3471 and No. 3472 to apply to imperfect self-defense as well as to self-defense. The People argue defendant failed to object in the trial court to the instruction and therefore forfeited the issue on appeal. However, in the alternative, defendant argues defense counsel performed ineffectively in failing to preserve the issue. We will address the issue.

Defendant faults the given instructions as incorrectly informing the jury that a person does not have the right to imperfect self-defense if he or she is the initial aggressor or a mutual combatant, or if the defendant provokes a fight with the intent to create an excuse to use force.

Defendant notes that self-defense and imperfect self-defense are available to a defendant who initiates a fight if the victim's use of force in response was unlawful. (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947-953.) Defendant contends that after he reached into Rozenski's pocket to get back his $13, "Rozenski's resistance and grabbing back at Johnson, was unlawful because it amounted to a theft or robbery." In the alternative, defendant alleges Rozenski escalated the fight: "[Rozenski] lunged at Johnson escalating the confrontation from one involving grabbing to one involving fists. Rozenski further escalated that fistfight by beginning to pull Johnson's dreadlocks and punch him in the head despite Johnson's pleas for him to stop. At that point Johnson did not believe he could stop Rozenski's assault with his hands. Accordingly, there is a reasonable probability that had the jury been properly instructed to focus on whether Rozenski's use of force was lawful, the jury would have concluded that it was not and found that Johnson retained the right to claim imperfect self-defense."

19

The record does not support defendant's gloss on the evidence. Defendant fails to explain exactly how Rozenski's response to defendant's grabbing constituted robbery or theft. Even if the jury believed defendant's statements to officers after his arrest, the evidence did not support perfect or imperfect self-defense. Defendant did not plead for Rozenski to stop pulling his hair: he threatened to stab him if he did not stop. Nothing before the jury would support a finding that defendant believed, reasonably or not, that he was in imminent danger of Rozenski's killing him or inflicting great bodily injury and that it was necessary for defendant to respond with deadly force to stop Rozenski. There was no evidence Rozenski was armed, and there was no basis for concluding that defendant stabbed Rozenski out of fear for his own life. The court's instructions were correct in light of the evidence presented.

**Modification of Torture Instruction**

Defendant contends the court erred in refusing his requested modification of CALCRIM No. 810. The modification would have advised the jury that the severity of the victim's wounds is not dispositive on intent and that severe wounds can be consistent with a killing in the heat of passion.

### *Background*

Defendant requested the following language incorporating CALCRIM No. 810: "An intent to inflict extreme pain may be inferred from the circumstances of the crime, the nature of the killing and the condition of the body. But you are cautioned against giving undue weight to the severity of Mr. Rozenski's wounds, because horrible wounds may be as consistent with a killing in the [heat] of passion as with intent to inflict cruel suffering."

The court declined the instruction modification, reasoning that the cases defendant cited in support of the instruction dealt with torture as a special circumstance or where torture was one of the theories of first degree murder. In contrast, "The People's theory for first degree murder was premeditation. There was no other theory the [P]eople are

20

relying on. Torture is a separate charge. And otherwise the torture instruction as it is presented by the Cal Crim is the proper statement of the law. And I find that it is an adequate instruction for the jury in the case."

The court instructed under CALCRIM No. 810: "The defendant is charged in Count Two with Torture in violation of Penal Code section 206.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant inflicted great bodily injury on someone else;

"And

"2. When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, persuasion, or for any sadistic purpose.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"Someone acts with a *sadistic purpose* if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself."

### *Discussion*

Defendant contends the trial court erred in refusing the modification to the instruction on torture to advise the jury that severe wounds can be consistent with a killing in the heat of passion. He argues the modification was a proper statement of the law and was crucial to his theory of defense. According to defendant, "Numerous cases have cautioned against giving undue weight to the severity of a victim's wounds in a torture prosecution because such wounds could have been inflicted in the heat of passion or during a mindless rage." In support, defendant relies on *People v. Cole* (2004) 33 Cal.4th 1158 (*Cole*) and *People v. Pensinger* (1991) 52 Cal.3d 1210 (*Pensinger*).

However, both *Cole* and *Pensinger* concerned murder by means of torture under section 189, not torture as alleged in the present case, section 206. (*Cole*, *supra*, 33 Cal.4th at pp. 1207-1208; *Pensinger*, *supra*, 52 Cal.3d at p. 1239.) Murder by means

21

of torture is murder committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain. (*People v. Steger* (1976) 16 Cal.3d 539, 546.)

Torture under section 206 does not require willful, deliberate, and premeditated intent. (*People v. Massie* (2006) 142 Cal.App.4th 365, 371 (*Massie*); *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1206.) However, defendant argues that *Massie*, "which is not a torture-murder case, similarly held that the severity of the victim's wounds should not be dispositive of an intent to cause cruel suffering and that a defendant who was acting in a mindless rage lacks the requisite intent necessary to uphold a torture conviction under section 206." In *Massie* we stated, "if the jury believes the accused acted in such a mindless rage that thought processes were impossible, then it may conclude he did not harbor the intent to inflict injury." (*Massie*, at p. 372.)

In *Massie* we rejected the defendant's contention that evidence of anger precludes a conviction for torture, since the intent required need not be formed as a result of premeditation and deliberation. We noted: "An explosion of anger may be inconsistent with the reflection necessary for premeditation and deliberation, but it is not at all inconsistent with an intent to inflict cruel or extreme pain and suffering, which may be the result of 'mere unconsidered or rash impulse hastily executed.' [Citation.]" (*Massie*, s*upra*, 142 Cal.App.4th at p. 372.) We noted the role anger may have played in a criminal attack is a jury question. The jury may logically determine that anger was the reason the defendant formed the intent to inflict injury. In contrast, if the jury believes the defendant acted in a mindless rage obliterating thought processes, it may logically conclude the defendant did not harbor the intent to inflict injury. (*Ibid.*) This final observation does not, as defendant argues, require that the court instruct on the severity of the victim's wounds. CALCRIM No. 810, the instruction given by the trial court, adequately instructed the jury that it must find that "[w]hen inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of

22

revenge, persuasion, or for any sadistic purpose." Accordingly, we find no instructional error.[6]

**Sufficiency of the Evidence**

Defendant argues insufficient evidence supports his conviction for torture. According to defendant, "There was insufficient evidence that [defendant] intended to torture Rozenski because all the evidence admitted during [defendant's] trial supported that he stabbed Rozenski repeatedly in the heat of passion . . . and not for the purpose of revenge, extortion, persuasion or for any sadistic purpose. The jury likely reached the contrary conclusion because it implied intent to torture from the severity of Rozenski's wounds."

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Unless it is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) If substantial evidence supports the verdict, we defer to the trier of fact and do not substitute our evaluation of witness credibility for that of the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) If the record supports the jury's findings, our

---

[6] Defendant contends the cumulative effect of the errors he alleges violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. We have found any error harmless, and any errors combined do not compel the conclusion that defendant was denied a fair trial. (*People v. Rundle* (2008) 43 Cal.4th 76, 199.)

belief that the circumstances might also reasonably support a contrary finding does not warrant a reversal of judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

Under section 206, torture consists of two elements: the infliction of great bodily injury, and the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. Torture focuses on the mind of the perpetrator but does not require that the defendant act with premeditation and deliberation or intend to inflict prolonged pain. Accordingly, the duration over which the offense occurred is relevant, but not necessarily determinative. Similarly, the severity of the wounds inflicted is relevant but not necessarily determinative. The intent with which a defendant acts is rarely susceptible of direct proof and generally must be inferred from the facts and circumstances surrounding the offense. (*Massie*, *supra*, 142 Cal.App.4th at pp. 370-371.)

Defendant argues there was insufficient evidence he intended to torture Rozenski because all the evidence at trial supported the conclusion that he stabbed the victim repeatedly in the heat of passion or imperfect self-defense, not for the purpose of revenge, extortion, persuasion, or sadistic purpose. According to defendant, the jury "likely reached the contrary conclusion because it implied intent to torture from the severity of Rozenski's wounds."

However, evidence presented at trial supports the jury's finding of torture based on revenge. During his interview with Detective Wallace, the detective asked: "So if someone had said . . . you had an issue with [Rozenski] because he had taken money at some point in time. And I think - come on man. You owe me some fucking money. Don't do me like that. You gotta be a man. You gotta pay me back. Is that something that happened?" Defendant replied, "Yeah." Wallace asked, "Okay. Did he steal from you or did he take advantage of you . . . go behind [your] back? What . . . did he do. . . ." Defendant answered, "I guess it's just that he took advantage 'cause I was drunk." Wallace inquired, "What did he take from you?" and defendant said, "$13." Defendant

24

subsequently told Wallace he felt cheated and slighted but that he had only been " a little bit" angry.

Mason testified he observed tension between defendant and Rozenski the night of the murder. Defendant wanted Mason to help him get his money back from Rozenski. An argument broke out between Rozenski and defendant after Rozenski produced fake crystal methamphetamine and refused to return defendant's money. Defendant grabbed Rozenski, who said, "[W]hy are you doing this to me?" and "I did you right." Mason told defendant to "just leave" Rozenski, but defendant refused. Defendant inflicted 57 sharp injuries to Rozenski's neck and head involving incisions and stab wounds, and 21 sharp injuries to Rozenski's hands, among other sharp and blunt force injuries.

Reviewing the whole record in the light most favorable to the verdict, drawing all reasonable inferences and resolving all conflicts in support of the jury's verdict, we find sufficient evidence supports its finding of torture. (*Massie, supra,* 142 Cal.App.4th at p. 371.) Defendant sliced and stabbed Rozenski because he believed the victim cheated him and he acted in revenge.

### *Batson*/*Wheeler* **Motion**

Finally, defendant argues the trial court erred in denying his *Batson*/*Wheeler* motion. He contends the prosecution exercised peremptory challenges on the basis of race.

#### *Background*

Defendant is African American; Rozenski was white. During voir dire the prosecution exercised peremptory challenges against three potential black jurors, juror No. 1, juror No. 2, and juror No. 3.[7] Defense counsel made a *Batson*/*Wheeler* motion.

---

[7] On appeal defendant does not challenge the prosecution's strike of prospective juror No. 2.

The prosecutor responded: "In regards to [prospective juror No. 3], since he was the most recent one, there were three [prospective] jurors, [No. 3], [No. 4] and . . . [No. 5]. When the Court initially asked all of the questions, those witnesses had no responses to anything. That's the first thing that I noted with those two witnesses.

"Then . . . [defense counsel] asked questions in regards to jurors['] first impression of those and questions regarding drugs. [Prospective jurors No. 5] and [No. 4] piped up. [Prospective juror No. 3], no response.

"My concern with [prospective juror No. 3] is this. One, [juror No. 3's] age, lack of experience. [Juror No. 3] . . . he's never been a victim of a crime, he's never been arrested for a crime. He doesn't know anybody who's been a victim of a crime. He doesn't know anybody who was arrested for a crime. [Juror No. 3] also lives in North Highlands, which is a high crime area.

"I don't think [prospective juror No. 3] has any type of experience regarding life. So I don't think he'll be able to understand the complexities of the law, or that [juror No. 3] is simply lying about the knowledge he has about victims, arrests, et cetera.

"So I don't think he's credible or a very good juror for the People because he lacks any experience in anything."

The prosecutor also addressed his dismissal of [prospective juror No. 1]: "[O]ne of the very first things [juror No. 1] said was, she's wondering if the defendant is going to get a fair trial now, something to that effect, which puts me on the defense that I have to prove my case more than something beyond a reasonable doubt. Her . . . concern that the defendant gets a fair trial based upon her prior experience in a jury where other people had those issues.

"My concern is those issues are going to come to play in my trial.

"So that's one thing she's concerned about, is whether or not this defendant, an African American defendant, is going to get a fair trial. I don't want her to bring those biases, opinions to the courtroom."

26

The court concluded: "I find that there has not been an exercise of a challenge to any of the three that are being challenged here, [prospective jurors No. 1], [No. 2] or [No. 3], that is based on race basis.

"And when [the prosecutor] has outlined as far as his challenges are, in fact, true, that those things did happen during the course of jury selection as far as what their statements are, or in the case of [prospective juror No. 3], his lack of experience, and those are proper bases for any attorney, whether they are on the prosecution side or the defense side, to exercise a challenge on a particular juror.

"So I don't find that there is a basis to grant a [W]heeler motion as to any of the three individuals challenged."

*Discussion*

The exclusion of prospective jurors based on their race, religion, or ethnicity violates the state and federal Constitutions. A defendant must raise the issue in a timely fashion and make a prima facie showing of racial motivation. The burden then shifts to the prosecution to present a race-neutral explanation for the challenged strikes. (*Batson*, *supra*, 476 U.S. at pp. 89, 97; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277, 280-281.) Once the prosecution states race-neutral reasons, the burden is on the defendant to show the reasons were pretextual and the prosecution's actual motivation was race. (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834]; *People v. Reynoso* (2003) 31 Cal.4th 903, 924 (*Reynoso*).)

On appeal, we defer to the trial court's finding of a lack of purposeful discrimination if the finding is supported by substantial evidence. Unless the record contradicts the prosecution's stated reasons, we uphold the court's finding of a lack of discriminatory intent. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196-197; *Reynoso*, *supra*, 31 Cal.4th at pp. 923-924.)

Defendant argues the prosecution "stated a race-based reason for striking potential juror [No. 1]. He said he believed he would have to prove his case to her 'more than

something beyond a reasonable doubt' because 'she's concerned about . . . whether or not this defendant, an African American defendant, is going to get a fair trial.  I don't want her to bring those biases, opinions to the courtroom.' "  Defendant labels the prosecution's reason "explicitly based" on race and thus the trial court erred in finding the reason race neutral.  We disagree.

### **Prospective Juror No. 1**

Prospective juror No. 1 expressed her concern that defendant would not receive a fair trial because he was a young African American male.  She did not explicitly say she would hold the People to a higher standard of proof than beyond a reasonable doubt.  However, given juror No. 1's comment, it was not unreasonable for the prosecution to be concerned that she would, in fact, require a higher standard of proof given defendant's age and race.  The prosecution dismissed juror No. 1 because of this concern over the burden of proof, not because of defendant's race.  The prosecutor's challenge need not be based on a ground that we approve of.  A peremptory challenge may be based on an idiosyncratic or arbitrary reason, or even on a hunch.  The question is whether the challenge was based on group bias, such as race or ethnicity.  Here we find no such bias.  (*People v. Aleman* (2016) 247 Cal.App.4th 660, 674.)

### **Prospective Juror No. 3**

Defendant also argues the prosecutor's stated reasons for excusing prospective juror No. 3 were not credible.  In support, defendant contends a comparative analysis of juror No. 3 and seated jurors No. 1 and No. 12 reveals the prosecution struck a potential black juror for reasons that applied to nonblack jurors he did not strike.

In dismissing prospective juror No. 3, the prosecutor cited the juror's lack of experience:  "he's never been a victim of a crime, he's never been arrested for a crime.  He doesn't know anybody who's been a victim of a crime.  He doesn't know anybody who was arrested for a crime."  Defendant points out that seated jurors No. 1 and No. 12 shared this lack of experience and were not dismissed.

28

However, in addition to prospective juror No. 3's lack of experience, the trial court also noted the juror's quiet demeanor.  The court inquired of juror No. 3, "[w]e haven't heard anything from you" and asked him to "speak up."  The court also asked juror No. 3 if it would "be fair to say you're a rather soft-spoken individual."  After juror No. 3 agreed he was, the court asked whether despite being "soft-spoken or potentially younger than your other 12 jurors" he would be able to speak up during deliberations and discuss the evidence presented at trial.  The prosecutor, in explaining his decision to strike prospective juror No. 3, referenced his quiet demeanor as well as his youth.  These additional concerns differentiate prospective juror No. 3 from seated jurors No. 1 and No. 12.

Accordingly, we find no *Batson*/*Wheeler* error during jury selection.

## DISPOSITION

The judgment is affirmed.


                                                                   _____RAYE_____, P. J.


We concur:


_____BLEASE_____, J.


_____MAURO_____, J.